**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| AMAZON WEB SERVICES, INC. | ) | **PUBLIC VERSION**<br>**8/16/13** |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |
| THE UNITED STATES OF AMERICA | ) | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Amazon Web Services, Inc. ("AWS"), by its undersigned counsel, hereby submits this bid protest Complaint for declaratory and injunctive relief.

## INTRODUCTION

1.    AWS challenges the implementation by the Central Intelligence Agency ("Agency") of a flawed Government Accountability Office ("GAO") decision sustaining, in part, the bid protests of IBM US Federal ("IBM") against a lawful contract award to AWS under Solicitation No. 2012-1204100001 (the "RFP").

2.    By the RFP, the Agency sought to access the leading technologies of the *commercial* cloud computing marketplace, i.e., Commercial Cloud Services ("C2S"), for the development and operation of a private, Intelligence Community cloud.    A disruptive technology, cloud computing (developed and delivered to the marketplace by AWS as early as 2006) has fundamentally transformed how governments, companies, and individuals view information technology ("IT") infrastructure and the methods and costs associated with handling data. From the Agency's perspective, the leading commercial cloud technologies have outpaced fixed Government IT counterparts. Cloud computing will provide the Intelligence Community

with a significantly improved ability to manage large scale data and other computing tasks over traditional fixed IT solutions.

3. AWS, the leading commercial cloud services provider, won the competition by a substantial margin:

|  | Amazon | IBM |
|---|---|---|
| Technical/Management |  |  |
| -- Technical Approach (Demo) | Very Good | Marginal |
| -- Technical Approach (Written) | Exceptional | Very Good |
| -- Service Level Agreements | Very Good | Satisfactory |
| -- Management Approach | Satisfactory | Very Good |
| Past Performance (confidence) | High | Moderate |
| Security | Pass | Pass |
| Proposed Price | ██████████ | ██████████ |
| Evaluated Price | $148.06 million | $93.9 million |
| Guaranteed Minimum | ██████████ | ██████████ |
| Overall Proposal Risk | Low | High |

(AR Tab 41, Source Selection Decision Mem. ("SSDM") at 1.) AWS beat IBM (a traditional fixed IT infrastructure provider and late entrant to the cloud computing market) *handily* in Technical/Management, Past Performance, and Overall Proposal Risk. IBM's ████████ ████████████████████████████████████████████████████████ ████████████████ exposed IBM's price advantage as a mirage.

4. IBM filed a series of GAO protests against the AWS contract award. On June 6, 2013, GAO sustained two IBM arguments, holding that: (i) the Agency improperly adjusted IBM's price on bidding Scenario 5 to accommodate IBM's non-compliant proposal; and (ii) the Agency improperly relaxed a solicitation term, RFP Commercial Clause 152.204-706(a), for AWS during post-selection negotiations. *See IBM U.S. Fed.*, B-407073.3 *et al.*, June 6, 2013, 2013 CPD ¶ 142 ("GAO Decision"), attached as Exhibit A. GAO denied the remainder of IBM's protests, affirming a technical deficiency related to IBM's inability to auto-scale all required services and a ████████████ assigned to IBM's price proposal.

- 2 -

████████████████████████████████████████████████████████
████████████████████████████████████████

5.      On July 9, 2013, the Agency followed GAO's flawed recommendation and reopened the C2S competition. The Agency amended the RFP, opened discussions with the offerors, and called for the submission of revised final proposal revisions ("FPRs") on or before August 16, 2013 at 1pm. As a result, this matter is now ripe for review.

6.      The Court must evaluate "the rationality of the GAO decision." *Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) (affirming finding that GAO's decision lacked reason). In so doing, the Court must adhere to well-settled law that Contracting Officers "are given broad discretion in their evaluation of bids," and "[w]hen an officer's decision is reasonable, neither a court *nor the GAO* may substitute its judgment for that of the agency." *Id.* (emphasis added). Here, the GAO decision contravenes well-established precedent regarding timeliness, standing, and prejudice, ignores several critical defenses entirely, and infringes on the Agency's substantial discretion to design and conduct procurements.

7.      With respect to IBM's Scenario 5 protest allegations, the record established IBM's protest as untimely in its entirety. Scenario 5 required offerors to price a data analytics solution involving simultaneous 100 terabyte ("TB") batches of raw data, assuming that the virtual machines associated with the scenario were operating at a "100% duty cycle", across each of four, one-year ordering periods. IBM and all other offerors submitted their *initial* proposals providing data analytics tools running continuously across the one-year ordering periods. For its FPR, however, IBM, seeking to exploit a perceived ambiguity in the instructions, dropped its initial Scenario 5 price from approximately ████████[1] (covering a 100% duty cycle across

---

[1]   Pursuant to Appendix C of this Court's Rules, AWS counsel has bracketed information that counsel believes may be subject to protection from public release. This Complaint may contain other information which counsel for the Agency or IBM seek to protect, given the prior protected record before GAO.

the one-year ordering periods) to ▇▇▇▇▇ (covering a single 100TB analytics runs across ▇▇

▇▇). (AR Tab 60-1, IBM Price FPR at VI-30.)[2] As the Contracting Officer noted:



(AR Tab 1, Contracting Officer's Statement ("COS") at 29.)

8.     GAO recognized that IBM's actions rendered IBM's protest regarding the ground rules of Scenario 5 untimely. (GAO Decision at 7, Ex. A.) GAO, nevertheless, jettisoned established law, re-characterized the IBM argument as a challenge to the price *evaluation*,[3] and found that the Agency had not solicited sufficient information to adjust IBM's price. (GAO Decision at 7-8.) As the Federal Circuit noted in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), neither a protester (nor a forum) may recast an untimely challenge to a solicitation's terms as an evaluation challenge: "While Blue & Gold characterizes this as a challenge to the evaluation of Hornblower's proposal, we agree with the Court of Federal Claims that this argument is properly characterized as a challenge to the terms of the solicitation."

9.     Despite extensive argument by the Agency and AWS, GAO's Scenario 5 decision never addressed the absence of competitive prejudice to IBM from the purported evaluation error. By definition, the Agency's good-faith attempt to adjust IBM's proposal (thereby

---

[2] AWS has cited to the Agency Record submitted in response to IBM's protests of the C2S Contract award at GAO. Based on the Court's Rules and practice, AWS understands that the United States will file the documents as part of the Administrative Record.

[3] Ironically, just weeks before, IBM had disavowed any challenge to how the Agency adjusted IBM's price, noting that IBM "does not challenge the specific calculations that the Agency used to adjust IBM's price.... But [contends that] the Agency never should have performed those calculations in the first place." (IBM Comments on Agency's Response to GAO Questions Regarding Scenario 5 Normalization at 1.)

permitting consideration of the proposal) *could not* have prejudiced IBM. Further, as the Agency

demonstrated, had the Agency adjusted AWS down to the *single* run per order bid by IBM, the

IBM Scenario 5 price advantage would have *decreased* substantially. Further, the evaluated

price calculated by the Agency by extending the duration of the IBM solution, yielded an FPR

Scenario 5 evaluated price ████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

Moreover, a greater Scenario 5 price advantage would not have favorably altered IBM's

Marginal technical approach rating, its moderate past performance rating, or its High Risk rating.

      10.    GAO's ruling on the substance of Scenario 5 also ignored that the Agency and its

cloud computing experts had *statutory* discretion and good reason to craft, as they did, the best

commercial efforts approach to Scenario 5. The Agency experts did not receive any deference

from GAO as to the technical specifications.

      11.    With respect to the Agency's purported relaxation of RFP Commercial Clause

152.204-706(a) -- the other sustained argument, GAO's decision fares no better. As a matter of

timing, the Agency made clear that each offeror could propose term revisions for post-selection

negotiation with the Agency. (AR Tab 8-1, Final Instr. to Offerors at 9.) The Agency identified

the five types of clauses that it would *not* modify, leaving Commercial Clause 154.204-706

Security Requirements -- Software Certification among the provisions that offerors could

propose to modify. (*Id.*; Ross K. Test. at 475:3-476:9.)[4] The Agency even advised IBM, prior to

FPR submission, that the Agency "reserves the right to negotiate all commercial terms and

conditions, if selected for award, under the select to negotiate process outlined in clause 152.215-

---

[4] The "Test." citations relate to a fact-finding hearing conducted by GAO on May 14, 2013.

████████████████████████████████████████████████████████

████████████████████████████████████████████

729AI Agency Alternate to FAR Provision 52.215-1 Alternate I (FEB 2011)." (AR Tab 29-2, IBM Discussion Items With Follow-up at 10 (████████████████ discussions on IBM's commercial term changes ███████████████).) To the extent that these ground rules left the competition unfair (which they did not), the law prohibited IBM from competing first and complaining later. *Burney v. United States*, 499 F. App'x 32 (Fed. Cir. 2012) (post award protest untimely where solicitation reserved right for government to act as it did).

12. As a matter of standing, the law cannot rationally countenance the bidding hypocrisy of IBM. IBM, fully understanding the ground rules that it later challenged at GAO, proposed ██████ contract revisions, including revisions to ████████████████ ████████████████████████████████████████████████████ ██████. (AR Tab 69, IBM Contract FPR at *passim*.) IBM even proposed revisions that ████████████████████████████████████████. (*Id.*)

13. As a matter of substance, clause 152.204-706(a) involves certifications related to offeror and third-party software. FAR 12.212 directs: "Commercial computer software ... *shall be acquired under licenses customarily provided to the public* to the extent such licenses are consistent with Federal law and otherwise satisfy the Government's needs." (emphasis added); *see also* FAR 27.405-3(a). GAO's determination that the Agency could not adjust this quintessential *software license* provision contravenes the FAR. Further, the Agency established that the limited AWS clarification of paragraph (a) of the clause did *not* reduce AWS's software screening and incident reporting obligations.

14. With respect to prejudice related to the AWS clarifying reading of 152.204-706(a), GAO applied the wrong legal standard. To establish competitive prejudice, a protester "must show that there was a *substantial chance it would have received the contract award* but

for" the alleged procurement error. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, __ F.3d __, 2013 WL 3185536, *7 (Fed. Cir. June 25, 2013) (emphasis added). In finding prejudice, GAO accepted IBM's assertion that AWS's clarification "reduced the burden of compliance, and the risks of non-compliance," for AWS and "allowed AWS to submit a more competitive proposal." (IBM 3d Supp. Prot. at 15; GAO Decision at 11 n.4, Ex. A.) IBM offered no proof and *GAO made no findings* regarding how IBM would have altered IBM's proposal sufficiently to give IBM a substantial chance for award (particularly given IBM's Marginal technical approach and High Risk ███) -- the correct legal question. *Elec. Data Sys. LLC v. United States*, 93 Fed. Cl. 416, 435 (2010) ("[T]o demonstrate prejudice in the context of a failed amendment, the protester must show that it 'would have altered its proposal to its competitive advantage had it been given the opportunity to respond to an altered requirement'").

15.    Finally, GAO improperly addressed the merits of IBM's protest *without* first considering whether IBM had standing as an interested party. The Agency demonstrated that IBM lacked standing based on the IBM auto-scaling deficiency: "[T]he IBM proposal may not form the basis for award" because "IBM failed to conform to the [RFP's] material requirements." (Agency April 1, 2013 Legal Mem. at 11.)[5] Although GAO *affirmed* the *deficiency* (and Marginal technical rating) and also affirmed the IBM High Risk rating (GAO Decision at 12-14, Ex. A), GAO *never* addressed IBM's consequent lack of standing as an interested party. *See COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1384 (Fed. Cir. 2012) ("Because Comint has not shown that its marginal Quality/Capability rating was arbitrary or capricious, Comint

---

[5] AWS repeatedly joined in this black letter legal request that GAO dismiss the IBM protest once GAO affirmed the IBM auto-scaling deficiency. (*See, e.g.*, AWS Post-Hearing Comments at 2.)

cannot show that it had a substantial chance of receiving the award. Comint thus cannot demonstrate standing to object to the agency's failure to award it a contract.").

16.     AWS, accordingly, respectfully requests that the Court (a) declare the GAO decision and the associated corrective action irrational and unlawful, (b) issue preliminary and permanent injunctive relief enjoining the Agency from recompeting the contract properly won by AWS, and (c) declare that the Agency should move forward with the AWS contract.

17.     In the alternative, the Agency's corrective action is exceedingly overbroad given the limited grounds on which GAO sustained the protest. With respect to Scenario 5 (assuming *arguendo* a legally-valid protest), the appropriate corrective action entails the Agency providing additional information and the offerors the opportunity to submit new Scenario 5 solutions based on their already-submitted price lists. GAO did not find any flaws with Scenarios 1-4 and 6, or the offerors' Catalog Prices. Permitting IBM, which now has AWS's price and ratings information, to reprice its entire proposal based on an alleged error with Scenario 5 is neither tailored nor reasonable.

18.     With respect to the *RFP-contemplated* post-selection negotiations and clause 152.204-706(a), GAO held: "While offerors were free to ask for changes, waiving a material term of the solicitation for only one of them, after the selection decision was made, was improper." (GAO Decision at 11 n.4, Ex. A.) The problem, accordingly, from GAO's perspective involved the Agency accepting AWS's proposed clarification to 152.204-706(a) as part of the post-selection negotiations. Given the holding, the appropriate corrective action involves the Agency reopening the post-selection negotiations with AWS and rejecting the AWS proposed clarification, not reopening the entire procurement. AWS already noted (before GAO and now before this Court) that it will waive the proposed clarification.

19.    Accordingly, AWS alternatively requests that the Court (a) declare that the Agency's corrective action is overbroad and in violation of federal law and regulation, (b) issue injunctive relief preventing resubmission and reevaluation of proposals beyond Scenario 5 and limiting the relief associated with RFP Commercial Clause 152.204-706(a) to a reopening of post-selection negotiations between AWS and the Agency.

## FEDERAL CLOUD COMPUTING GENERALLY AND THE PARTIES

20.    Cloud computing is "a model for enabling convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction." Federal Cloud Computing Strategy at 5, *available at* http://www.whitehouse.gov/sites/default/files/omb/assets/egov_docs/federal-cloud-computing-strategy.pdf.   The National Institute of Standards and Technology ("NIST") has "identified five essential characteristics of cloud computing:  on-demand service, broad network access, resource pooling, rapid elasticity, and measured service." *Id.* Cloud computing services enable IT systems to be scalable and elastic.  End users need not determine upfront their exact computing resources requirements.  Instead, users can provision computing resources as required on-demand. *Id.* at 6.

21.    In early February 2011, the United States Chief Information Officer (the "CIO") issued a Federal Cloud Computing Strategy.  He observed that the existing IT environment was saddled with inefficiencies, including low asset utilization, duplicative systems, fragmented demand for services, etc. *Id.* at 1.  By moving to a cloud computing model, federal agencies "will be able to measure and pay for only the IT resources they consume, increase or decrease their usage to match requirements and budget constraints, and leverage the shared underlying

- 9 -

capacity of IT resources via a network." *Id.* at 2. The CIO concluded that "[a]pplying cloud technologies across the entire Federal Government can yield tremendous benefits in efficiency, agility, and innovation." *Id.* at 7.

22.    In June 2012, the Director of National Intelligence ("DNI") identified the cloud environment "as a critical component of the overarching IC [Intelligence Community] Information Technology Enterprise." (AR Tab 54, Mem. to CIA Director.) The DNI designated the Agency to provide *Commercial* Cloud Hosting Environment services to the Intelligence Community by administrating the C2S program and procurement. (*Id.*)

23.    In 2006, AWS began exposing key scalable infrastructure services to businesses in the form of web services -- now widely known as cloud computing. *See* Cade Metz, *The Cult of Amazon: How a Bookseller Invented The Future of Computing*, Wired (Nov. 27, 2012), www.wired.com/wiredenterprise/2012/11/amazon. Although a few companies realized that this model could fundamentally alter the path of computing, most did not, providing AWS with a multiple-year head start on late adapters. Not surprisingly, AWS is the widely-regarded marketplace leader:



Source: Gartner (October 2012)
Copyright Gartner, reprinted with permission by Tier 3

- 10 -

*See* Reuven Cohen, *Gartner Announces 2012 Magic Quadrant for Cloud Infrastructure as a Service* (Oct. 22, 2012), http://www.forbes.com/sites/reuvencohen/2012/10/22/gartner-announces-2012-magic-quadrant-for-cloud-infrastructure-as-a-service/.[6]

24. AWS provides a highly-reliable, scalable, low-cost infrastructure platform in the cloud that powers hundreds of thousands of customers in 190 countries around the world.

25. On or about May 21, 2013, AWS became the first large commercial cloud provider to obtain certification under the government-wide Federal Risk and Authorization Program, known as "FEDRAMP." FEDRAMP protects federal information in cloud services by providing government-wide "[s]tandardized security requirements for the authorization and ongoing cybersecurity of cloud services." Mem. by CIO dated 12/8/11, http://www.whitehouse.gov/sites/default/files/omb/assets/egov_docs/fedrampmemo.pdf. To receive FEDRAMP certification, the cloud service provider must satisfy a series of rigorous federal information security requirements.

26. IBM is a large, publicly-traded contractor. Although IBM belatedly has moved into cloud computing, IBM does not even register on many leading Commercial Cloud

---

[6] Gartner, a leading IT research and advisory company, annually compiles a list of the top providers of cloud computing infrastructure as a service, evaluating companies' "ability to execute" and "completeness of vision." Gartner illustrates the relative positions of competitors in a chart called the Gartner Magic Quadrant ("MQ"), which is "perhaps, the most renowned artifact in the technology analyst industry.... IT organizations use the MQ as a filtering mechanism; by definition, inclusion in the MQ bestows an imprimatur of technology leadership." Bernard Golden, *Gartner Cloud Computing Magic Quadrant Pits AWS Against the World* (Jan. 14, 2013), http://www.cio.com/article/726327/Gartner_Cloud_Computing_Magic_Quadrant_Pits_AWS_Against_the_World?page=1&taxonomyId=3024. For the past two years, AWS has led the cloud services industry on Gartner's MQ. Gartner describes AWS as "the market share leader, and a thought leader; it is extraordinarily innovative, exceptionally agile and very responsive to the market. It has the richest IaaS product portfolio, and is constantly expanding its service offerings and reducing its prices." *See* Reuven Cohen, *Gartner Announces 2012 Magic Quadrant for Cloud Infrastructure as a Service* (Oct. 22, 2012), http://www.forbes.com/sites/reuvencohen/2012/10/22/gartner-announces-2012-magic-quadrant-for-cloud-infrastructure-as-a-service/.

Computing analyses. *See* Reuven Cohen, *Gartner Announces 2012 Magic Quadrant for Cloud Infrastructure as a Service* (Oct. 22, 2012), http://www.forbes.com/sites/reuvencohen/2012/10/22/gartner-announces-2012-magic-quadrant-for-cloud-infrastructure-as-a-service/ (ranking ten largest cloud services providers).

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b).

28.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1491(b).

## STANDING

29.     AWS has standing to file this action because the Agency's decision to implement GAO's irrational and unlawful recommendation and to take corrective action affects AWS's direct economic interests in several significant ways including by: (1) effectively nullifying the prior contract award and requiring AWS to compete a second time and win the same contract twice, *see CBY Design Builders v. United States*, 105 Fed. Cl. 303, 337-38 (2012); *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 149-50 (2010); (2) forcing AWS unnecessarily to expend the time, effort, and expense of recompeting for a contract it has already lawfully won, *see Sys. Appl'n & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 710 (2011); *Jacobs Tech. v. United States*, 100 Fed. Cl. 173, 177 (2011); (3) delaying AWS's performance and income under the awarded contract, *Sys. Appl'n*, 100 Fed. Cl. at 710; and (4) requiring AWS to compete against itself as the Agency released AWS competition-sensitive information to the unsuccessful offerors during debriefings. *Id.*; *Sheridan Corp.*, 95 Fed. Cl. at 150.

## FACTUAL BACKGROUND

### The RFP Prior To Corrective Action

30. The Agency's C2S Program seeks cloud computing services from an established cloud provider. (AR Tab 5-4, Statement of Objectives ("SOO") at 2.)

31. The Agency issued the RFP in mid-June 2012 (AR Tab 5, Final RFP), seeking "instantiation of the public cloud offering of an internet-scale provider, to be installed on government premises and operated by the provider as a service," i.e., the awardee will use its commercial cloud technology to establish, maintain, and operate a private cloud for the Intelligence Community. (AR Tab 32-1, System Requirements Document ("SRD") at 1.)

32. The RFP contemplates the best value award of a single fixed-priced, indefinite delivery/indefinite quantity ("ID/IQ") contract. The RFP includes a five-year base period, one three-year option period, and a second two-year option period. (AR Tab 8-12, SF 1449 at 6.)

33. Under the C2S Program, the Intelligence Community entities are the cloud consumers, the Agency's C2S Program Office is the Cloud Auditor, Cloud Carrier, and Cloud Broker, and the commercial vendor is the Cloud Provider performing service deployment, service orchestration, cloud services management, and security. (AR Tab 32-1, SRD at 4.)

34. The RFP covers two general types of cloud computing services: Infrastructure as a Service ("IaaS") and Platform as a Service ("PaaS"). (AR Tab 32-1, SRD at 4.) IaaS and PaaS differ with respect to the type of IT services delivered by cloud provider:



Figure 2-2 Cloud Computing Technology-Centric Perspective

(*Id.* at 5.)

35.     To meet the stated C2S objectives, the RFP provides for an initial Mandatory Qualification evaluation to verify that each offeror is an established cloud service provider with an existing, large scale public offering, e.g., a "significant market presence in the public cloud IaaS services, as demonstrated by more than 10,000 Virtual Machines (VM) in production use in their public cloud, or more than $10 million in annual cloud compute IaaS revenue for each of the years 2010 and 2011." (AR Tab 8-2, Final Eval. Criteria at 1-2.)

36.     For each offeror passing the Mandatory Qualification, the RFP calls for the Agency to evaluate the proposal in the areas of: (a) Technical/Management; (b) Past Performance; (c) Security (evaluated on a pass/fail basis); and (d) Price. (*Id.* at 2-5.) The RFP also requires assignment of a risk rating for use in the best value tradeoff. (*Id.* at 1.)

37.     Under the RFP, the Non-Price items combined are slightly more important than Price.  (AR Tab 8-2, Final Eval. Criteria at 1.)   Within the Non-Price items, the offeror's Technical/Management approach is significantly more important than Past Performance.  (*Id.*)

38.     The RFP Technical/Management Item includes three factors:     Technical Approach, Service Level Agreements ("SLAs"), and Management.  (*Id.* at 2.)   Technical Approach is significantly more important than the SLAs Factor and the SLAs Factor is more important than Management.  (*Id.*)  The RFP further divides the Technical Approach Factor into Demonstration/Oral Presentations and Written subfactors.  (*Id.*)  The Demonstration subfactor covers the characteristics of each offeror's existing public cloud services and the Written subfactor serves to evaluate each offeror's approach of using the public cloud service offerings to meet the C2S requirements.  (*Id.* at 2.)

39.     The RFP requires offerors to submit pricing for: (a) Task Order 1, program management to support Initial Operating Capacity ("IOC") on a firm Fixed Price basis;[7] (b) Task Order 2, a guaranteed minimum amount for one year starting at IOC of cloud services priced at firm fixed prices; (c) Cloud Services Prices for six scenarios described in the Price Template; and (d) a listing of the cloud services and prices in the offeror's service catalog.  (AR Tab 32-4, Price Template.)  The RFP explains that, during the first year of performance, at the end of each quarter, if the total service costs ordered by the Government are less than 25% of the guaranteed minimum, the Agency will pay the contractor the difference.  (AR Tab 8-1, Final Instr. to Offerors at 16.)   The RFP contemplated this reconciliation process on a quarterly basis throughout the first year of performance.  (*Id.*)

---

[7] The RFP schedule contemplates an implementation period of 270 days, i.e., the contractor must meet all IOC requirements within 270 days of contract award.  (AR Tab 5-4, SOO at 2.)

40.     The Price Template instructs offerors to use the service catalog to price the six scenarios and to calculate the total cost of catalog orders using the Government-provided estimates of orders by scenario.  (AR Tab 32-4, Price Template at Cloud Services Prices Tab.) The Instructions read: "The scenarios will be priced starting with the one-year ordering period starting at IOC."  (*Id.*)

41.     For Scenarios 1, 2, 3, 4, and 5, the RFP advises offerors to "assume 100% duty cycle on all virtual machines associated with th[e] scenario."  (*Id.* at Scenario Description Tab.) Scenario 6 instructs offerors to assume a "50% duty cycle."  (*Id.*)

42.     Scenario 5 calls for data analytics and states:

> This scenario centers around providing a hosting environment for applications which process vast amounts of information in parallel on large clusters (1000s of nodes) of commodity hardware in a reliable, fault-tolerant manner (MapReduce). The solution to this scenario should automatically provision clusters of compute for the segmentation and parallel processing of input datasets via the MapReduce framework (3.4.1) where the vendor is responsible for the management of the OS and MapReduce implementation.  Assume a cluster large enough to process 100TB of raw input data.  Assume input data set was loaded from available object-based storage that realizes 6 reads/second and 2 writes/second. **Assume 100% duty cycle on all virtual machines associated with this scenario**....

(*Id.* at Scenario Description Tab.)[8]

43.     The RFP directs the Agency to evaluate Price "for completeness and reasonableness." (AR Tab 8-2, Final Eval. Criteria at 5.)  The RFP advises offerors that the total evaluated price will include the proposed value for Task Order 1 and Cloud Services (i.e., the scenario prices), but will not include the value for Task Order 2, the Guaranteed Minimum. (*Id.* at 5.)  Task Order 2, the guaranteed minimum, serves "to allow the offeror to recover a portion of

---

[8] All boldface emphasis of quoted material set forth in this Complaint is added unless otherwise specified.

the upfront infrastructure expenditures and to reduce their cost risk." (*Id.*) The RFP further advises that the "guaranteed minimum ... will be used within the Government's overall risk rating involved with this acquisition." (*Id.*)

44. The RFP includes a select-to-negotiate process: "The Government intends to select for final negotiations a contractor(s) resulting from this solicitation whose proposal represents the best value after evaluation in accordance with the factors and sub-factors in the solicitation." (AR Tab 8-12 SF 1449 at 47.)

45. The RFP makes clear that offerors may propose commercial terms and that the Agency may negotiate the terms as part of the post-selection process:

> In accordance with FAR 12.213, the offeror's solution may include commercial license/terms and conditions that are customarily included within their commercial transactions. The offeror shall propose any such language within this section for the Government to review for potential inclusion within this acquisition...

(AR Tab 8-1, Final Instr. to Offerors at 9.)

46. Equally significant, the RFP identifies the few commercial terms that offerors may not propose:

> The Government cannot accept the following terms & conditions because they are inconsistent with Federal law:
>
> - Unlimited indemnification of the vendor by the Government. Such terms violate the Anti-deficiency Act.
>
> - Indemnification provisions that provide the vendor "sole control of the defense" in litigation with third parties. The U.S. Department of Justice represents the Federal Government in litigation.
>
> - Terms that specify litigation will take place in state or local courts and terms that specify a particular state's laws apply. Federal contracts are subject to Federal law and Federal courts have jurisdiction when the Federal government is a party.

- 17 -

- Terms that require binding arbitration.

- Late payment provisions. The Prompt Payment Act will apply.

(AR Tab 8-1, Final Instr. to Offerors at 9.)

47. The RFP also includes various security requirements. For instance, clause 152.204-706, set forth in the RFP under the heading "CS Commercial Clauses" (AR Tab 8-12, SF 1449 at 3), addresses software security requirements and provides:

> 152.204-706 Security Requirements - Software Certification (DEC 2011)
>
> (a) The Contractor certifies that it will undertake to ensure that any software to be provided or any Government Furnished Software to be returned, under this contract will be provided or returned free from computer virus, which could damage, destroy, or maliciously alter software, firmware, or hardware, or which could reveal to unauthorized persons any data or other information accessed through or processed by the software.
>
> (b) The Contractor shall immediately inform the Contracting Officer when it has a reasonable suspicion that any software provided or returned, to be provided or returned, or associated with the production may cause the harm described in paragraph (a) above.
>
> (c) If the Contractor intends to include in the delivered software any computer code not essential to the contractual requirement, this shall be explained in full detail to the Contracting Officer and Contracting Officer's Technical Representative (COTR).
>
> (d) The Contractor acknowledges its duty to exercise reasonable care, to include the following, in the course of contract performance:
>
>> (1) Using on a regular basis current versions of commercially available anti-virus software to guard against computer viruses when introducing maintenance, diagnostic, or other software into computers; and
>>
>> (2) Prohibiting the use of non-contract related software on computers, especially from unknown or unreliable sources.

(*Id.* at 15.)

████████████████████████████████████████

48.     The SRD also describes assessment and authorization requirements, and incorporates Intelligence Community Direction 503.  (AR Tab 32-1, Final SRD at 7 (describing Assessment and Authorization responsibilities); *id.* at 21 (SRD 3.13.2 ("C2S infrastructure and services shall be assessed and authorized in accordance with . . . (ICD) 503 (reference 3).");  *id.* at 22 (SRD 3.13.12 ("For PaaS services all OS and platform layer software will be security approved and A&A'd per Sponsor guidelines");  *id.* at 22-23 (SRD 3.13.13 ("For PaaS services all OS and platform layer software components shall be placed under continual security monitoring....");  *id.* at 23 (SRD 3.13.23 ("The provider shall patch and update the hypervisor and virtualization host as per NIST guidelines and sponsor specifications.").)

49.     Additionally, the RFP directs each offeror to submit a System Security Plan ("SSP"), providing an overview of information system security and the controls and critical elements that the contractor will implement.  (AR Tab 5-22, ICD Template Guide at 2, 3.)

**The Prior Competition and Award to AWS**

50.     After a draft and other industry exchanges, the Agency issued the final RFP in June 2012.  (AR Tab 5, RFP.)

51.     ████████████████████████████████████████████████
████████████████████████████████████

52.     ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

53.     ████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████

[REDACTED]

54.    The Agency permitted offerors to ask questions about the final RFP and published responses to those questions prior to the initial proposal submission deadline.  (AR Tab 7, RFP Questions and Answers.)

55.    [REDACTED]

IBM asked several questions to the Agency prior to submitting its initial proposal.  (AR Tab 7-2, Final RFP Questions at 9-10 (Questions 49 and 50).)

56.    For instance, IBM asked whether orders as used in the Scenario 5 instructions were the "number of new images of that scenario type" or the "number of instantiations/runs of the scenario type in the year."  (*Id.* at 9 (Question 49).)  The Agency responded:  "As outlined in the scenario, the servers should be treated as operating on 100% duty cycle and should be priced out as simultaneous orders."  (*Id.*)

57.    [REDACTED]

[REDACTED]

[REDACTED]

58. Consequently, IBM asked for more detailed specifications for Scenario 5 including, the size of the data and "anticipated average number of instantiations / runs of each scenario type (daily, monthly, etc.)?" (*Id.* at 10 (Question 50).) In response, the Agency reiterated the 100% duty cycle instruction, that orders should be priced out simultaneously, and that the offeror should propose "commercial best practices":

| RFP Question 50 From IBM | Agency Answer |
|---|---|
| 1. Is the loading of data from the object store to direct attached storage done by the applications at run-time or pre-loaded for processing? If pre-loaded, how and when? | As outlined in the scenario, the servers should be treated a operating on 100% duty cycle and should be priced out as simultaneous orders. |
| 2. Is it accurate to say that the cluster of n (1000s of) nodes will operate on the distributed 100TB of data each run which means each node will consume and analyze approximately 0.1TB and that the 100TB is an operational maximum per run? | The contractor should propose commercial best practices derived from their commercially available solution(s) to provide data analytics via the MapReduce software framework to concurrent users from multiple organizations. |
| 2b. What are expected to be the average size of data loaded from object store to direct attached storage across all jobs? | |
| 3. Is it anticipated that there will be concurrent Data Analytics users running jobs. What is the anticipated average number of instantiations / runs of each scenario type (daily, monthly, etc.)? | The government will issue an amendment to the solicitation deleting the requirement in scenario 5 to process 100 TB of raw input data on direct attached storage. |
| 3.b. How many analytic jobs (scenario 5) are expected to be concurrently executing? | |
| 4. Will the client object-data be stored in the DOS as pre-sized objects (100TB or 0.1TB or other; what averages/range?),.... or will there be one or more blobs that must be divided into 0.1TB (or other size) chunks for distributed processing by the cluster? | |

(*Id.*)

59. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████, IBM did not seek further clarification or

object.

60.     Instead, IBM submitted an initial proposal, pricing Scenario 5 at approximately

██████████ and interpreting the instructions as seeking a solution to process 100TB of data

continuously throughout the year.

61.     *All four offerors* submitted initial price proposals interpreting the 100% duty cycle

instruction in Scenario 5 as calling for continual deployment of the data analytics tools for a full

year period or 8,760 hours:

- AR Tab 58, ██████████ Init. Price Prop. at 17 ██████████████████
  ████████████████ ;

- AR Tab 59, ██████ Init. Price Prop. at VI-19 ████████████████████
  ████████████████ ;

- AR Tab 57, AWS Init. Price Prop. at VI-24 ("Team AWS has assumed in this scenario
  that ██████████████ would be 100% utilized over the 4 year period"); and

- AR Tab 56, IBM Init. Price Prop. at VI-17 (showing 12 months of operation at 100%
  duty cycle).

62.     Each of the offerors, including IBM, also took full advantage of the commercial

terms/select-to-negotiate process, proposing qualifications and clarifications ████████████

████████████████████████████████████████████████

██████

████████████████████████████████████████
████████████████████████

63. Following initial proposal submission, each of the offerors provided an oral demonstration of their public cloud offering and the Agency evaluated the initial offerings pursuant to the RFP.

64. In mid-October 2012, the Source Selection Authority ("SSA") based on a recommendation by the Source Selection Evaluation Board ("SSEB") decided to have a competitive range of three offerors: AWS, IBM, and a third offeror.

65. On November 1, 2012, the Agency entered into discussions with the competitive range offerors. The written discussions items included, as evaluated by the Agency, all weaknesses, deficiencies, price concerns, and contract terms and conditions concerns. (AR Tabs 24-26.) The Agency also conducted oral discussions with each offeror to answer any follow-up questions and to ensure a clear understanding of the written discussion items. At the end of the oral discussions, the Agency provided each offeror with a written copy of the Agency's responses to the offeror's follow-up questions. (AR Tabs 29 and 30.)

66. During discussions, the Agency reminded IBM that the Agency reserved the right to negotiate *all* commercial terms and conditions with the offeror selected for award under the select-to-negotiate process: "The Government reserves the right to negotiate all commercial terms and conditions, if selected for award, under the select to negotiate process outlined in clause 152.215-729AI Agency Alternate to FAR Provision 52.215-1 Alternate I (FEB 2011)." (AR Tab 29-2, IBM Discussion Items With Follow-up at 10.) The Agency even reserved the right to "introduce additional terms and conditions" during the "select to negotiate process" if deemed necessary. (*Id.*) As noted above, the RFP specifically identified 152.204-706 under the heading "Commercial Clauses". (AR Tab 8-12, SF 1449 at 3.)

67.    During discussions, the Agency also identified to IBM ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████.

68.    Despite taking advantage of the opportunity for follow-up questions and oral discussions with the Agency, IBM made *no* inquiries or comments regarding Scenario 5, i.e., IBM choose not to share its "reinterpretation" of Scenario 5 with the Agency. (AR Tab 29-2, IBM Discussion Items With Follow-up at 9.) IBM also did not object to the select-to-negotiate process.

69.    On November 20, 2012, the Agency issued Amendment 4 calling for FPRs. Although the Agency permitted offerors to submit questions and responded to those questions prior to the FPR deadline (AR Tab 33), IBM again asked no questions and made no comments regarding Scenario 5 or the select-to-negotiate process. (AR Tab 33-2, IBM Clarification Questions on FPR (Amd. 4) (seeking clarification on Scenarios 1 and 4 only).)

70.    The Agency received FPRs from all competitive range offerors on or about December 20, 2012.

---

[9] The Agency's witness testified at the GAO hearing that the evaluators identified no issue with IBM's initial proposal approach to Scenario 5 because IBM bid its solution for 12 months at a 100% duty cycle. ███████████████████████████████████████████████ (Holloway Test. at 301:5-20.)

███████████████████████████████████████
███████████████████████████

71.     For the Price FPRs, AWS and the third offeror continued to interpret 100% duty cycle in Scenario 5 as calling for continuous operation of the data analytic tools for the full year ordering period. (AR Tab 62-1, AWS Price FPR at VI-33 ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████; AR Tab 63, ████████ Price FPR at 22 ████████████████████████████████████ ████████████████████████████████████████████)

72.     ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████.

73.     In its FPR, IBM "reinterpreted" Scenario 5 as calling for data analytics tools performing a *single* processing run on 100TB of data, ██████████████████████ ████████ ████████ ██ ████████. (*See e.g.*, AR Tab 60-1, IBM Price FPR at VI-30.)

74.     The Price Evaluation Team ("PET") evaluated the offerors' FPR prices for reasonableness, completeness, and risk in accordance with the RFP. (AR Tab 34, PET FPR Report.)

75.     When evaluating the FPR scenario prices, the Agency upwardly adjusted IBM's Scenario 5 price because IBM proposed a cost for only a single data analytics set rather than a year's worth of data analytics support as required. (*Id.*)

76.     The Agency did not normalize IBM, or any other offeror, to a common, should-have bid price or change the technical solutions proposed by any offeror. (AR Tab 61, Support Doc for PET.)

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

77.     The Agency did not alter any catalog unit price proposed by IBM.  (*Id.; see also* AR Tab 40, SSEB Briefing to the SSA at 69.)

78.     The Agency's evaluation did not alter IBM's proposed technical approach to Scenario 5.  (AR Tab 40, SSEB Briefing to the SSA at 69.)

79.     Rather, the Agency extended the IBM-proposed, commercial best practice offered in the FPR to provide a full year 100% duty cycle of support as required by the RFP instructions. The Agency did this by ████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████  ████████  ████████████████████
██  ██████  ████████████████████████)

80.     The Agency's calculation yielded a Scenario 5 price for IBM of approximately ████████████████████  ████████  ████████████████████
████████████████████.

81.     AWS's total evaluated price was $148,061,628 and IBM's total evaluated price was $93,917,785.  (AR Tab 41, SSDM at 7.)

82.     ██████████████████████████████████  ████████  ██
████████████████  ████████████████

83.     Based on IBM's ████████████████  ████████████████
████████████████████████████████████████████
████████████████████████████████████████, the Agency

- 26 -

████████████████████████████████████████

determined that IBM's price proposal ████████████. (AR Tab 37, SSEB Mem. at 19-20.)

84. In its FPR Contract Volume Cover Letter, AWS proposed the following clarifying reading to paragraph (a) of clause 152.204-706 based on AWS's commercial terms and conditions: "Under AWS Terms and Conditions, only software developed and provided by AWS would be subject to this requirement." (*See e.g.*, AWS FPR Cover Letter at 2.) AWS did not alter paragraphs (b), (c), or (d) of the clause.

85. In its FPR, IBM also clarified various standard contract clauses and proposed commercial terms and conditions. (AR Tab 69, IBM Contract FPR at 5-2.) For instance, IBM ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. (*Id.* at 5-2 to 5-18.). IBM █████████████████████████████████. (*Id.* at 5-5.) IBM proposed ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (*Id.* at 5-3.) IBM only ████████████ ███████████████████████████ (*Id.* at 5-3 to 5-5.)

86. IBM also included in its Contract FPR a section ████████████ ██████████████████████ under which IBM made clear that ██████ ████ █████████████████████



████████████████████████████████████████████
██████████████████████████████



(*Id.* at 5-15; *see also id.* at 5-8

.)

87.    In addition, IBM

(*Id.* at 5-17.)

88.    The Technical Management Evaluation Team ("TMET") completed its evaluation of the offerors' FPRs in late January 2013.  (AR Tab 35, Final TMET Reports.)

89.    AWS bested IBM in both Technical Approach subfactors:

| Technical Approach Factor | AWS | IBM |
|---|---|---|
| 2.1.1 (Demonstration/Oral Presentation) | 8 - Very Good | ▮Marginal |
| 2.1.2 (Written) | 10 - Exceptional | ▮Very Good |

(AR Tab 37, SSEB Mem. at 2.)

90.    For subfactor 2.1.1, the Agency identified, among other things, ▮▮▮▮▮ ▮▮▮▮▮ one deficiency in IBM's proposed approach. The deficiency related to IBM's failure to demonstrate the full capability to auto-scale as required by SRD 3.4.11 and 3.9.1. (AR Tab 35-2, TMET FPR Report at 7-8.) The Agency also noted ▮▮▮▮▮▮ ▮▮



(*Id.* at 4-5.)

91.    Under subfactor 2.1.2, the Agency ▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ assigned IBM a Very Good rating. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (*Id.* at 17-18.) The Agency observed:

▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (*Id.* at 18.) Second, the Agency assessed a significant weakness for IBM's failure to show how its C2S solution would overcome the auto-scaling deficiency in its public cloud offering in order to meet the C2S requirements. (*Id.*)

92.    For the remaining Technical/Management factors, AWS received a Very Good and IBM received a Satisfactory for the SLAs factor, while IBM received Very Good and AWS received a Satisfactory for the Management factor. (AR Tab 40, Revised SSEB Briefing to SSA at 28.)

93.    AWS bested IBM under the Past Performance Item, earning a Significant Confidence rating ████████████████████████████████████ ███████ while IBM earned only a Moderate rating. (*Id.* at 43, 66.)

94.    Risk also was a discriminator for AWS. AWS earned an overall Low Risk rating, while the Agency assessed IBM's overall proposal as High Risk:

> The combination of Amazon's risk rating of low for technical, security, and price equate to an overall risk rating of low. Due to the superior technical approach found in Amazon's proposal, the proposed solution is likely to cause minimum or no impact in performance, increase in cost or disruption of schedule.

* * *

████████████████████████████████████████████████████████████

(*Id.* at 49, 73.)

95.    Based on the foregoing evaluation results, on February 1, 2013, the Source Selection Evaluation Team ("SSET") presented to the SSEB and the SSO an integrated assessment and recommendation to select AWS as the best value.

████████████████████████████████████████████████████████████

96. The SSEB and SSO agreed that AWS represented the best value and submitted their recommendation to the SSA in early 2013. (AR Tab 37, SSEB Mem.)

97. After review of the evaluation documentation, on February 7, 2013, the SSA issued her SSDM. (AR Tab 41, SSDM.)

98. In performing her tradeoff and finding AWS the best value at its evaluated price, the SSA reasoned:

> Amazon's proposal contained a number of unique, differentiating capabilities that are considered highly advantageous to the Government. In several areas they exceeded the government's requirements, providing enhanced capabilities and an overall superior technical solution. . . . Since the benefits of C2S can only be seen after customers transition into the environment, ███████████████
> ████████████████████.
>
> Taking the significant technical advantages of Amazon's proposal, a tradeoff analysis was performed. Amazon's price is $148,061,628, while IBM's is $93,917,785 over the five year period. I do not believe that the $54 million difference, over five years, outweighs Amazon's strengths - specifically their superior technical solution. The additional cost to the Government of awarding to Amazon is justified by their proposed superior overall approach, which will lower barriers to entry for C2S users and increase the likelihood of customer adoption. Amazon has been evaluated to be able to deliver the best value to the Government.

(AR Tab 41, SSDM at 8.)

99. In her selection decision, the SSA documented numerous "unique, differentiating capabilities" offered by AWS, which the SSA "considered highly advantageous to the Government":

- Amazon's user interface was found to be the most flexible and intuitive. ███████
  ███████████████████████████████████

- Amazon's cloud demonstrated an ability to operate at scale that exceeded the demonstration requirements. This gives the Sponsor great confidence that as the C2S infrastructure grows it will continue to perform as required.

███████████████████████████████████
███████████████████████████████

- Amazon's Cloudwatch monitoring capability provides a single, integrated tool that allows customers to monitor SLA compliance and set additional user-defined monitoring points. This tool allows customers to clearly see that their services are operating as expected, as well as customize metrics to improve visibility into the functionality of their services. Additionally, customers can set auto-scaling triggers based on any of these metrics.

- 

- Amazon's production storage solution exceeds the requirements in SRD 3.7, These features will enhance the customer experience and provide additional protections for C2S user data.

- Amazon leverages a custom-built networking infrastructure, providing improved performance and reliability at the network layer.

(AR Tab 41, SSDM at 4-5.)

100. The SSA also noted the following "additional strengths" offered by AWS's technical approach, further supporting award to AWS:

- Amazon's plan to bring innovation into the C2S environment is a significant strength that addresses a primary objective of the C2S acquisition. Their approach discusses how they added over 200 innovations to their public cloud in the last four years and how they will incorporate market-driven service offerings into the C2S environment, which will routinely provide C2S users with new service offerings.

- Amazon has a strong approach to protect against supply chain threats, which reduces the risk to the overall C2S program.

- Amazon intends to operate ████████████████████ ████████ Since the Sponsor is responsible ████████████████████, this will reduce the Sponsor's ████████ costs.

- Amazon proposes ████████████ ████████████████████████████████████ ████████████████████████████

(AR Tab 41, SSDM at 5.)

101. In addition, the SSA observed that AWS had a higher past performance rating than IBM, which gave the "Government an increased confidence in Amazon's ability to successfully deliver for the C2S program." (*Id.* at 6.) The SSA also observed that AWS offered a Low Risk approach while IBM offered a High Risk approach. (*Id.* at 7.) Among other things, the SSA noted that ████████████████████████████████████████████ ████████████████████████████

102. As noted, the RFP contemplated a select-to-negotiate process with the best value offeror in accordance with clause 152.215-729 Alt1. (AR Tab 8-12, SF 1449 at 47.) The Agency provided AWS with instructions for the final negotiations and a list of items, approved by the SSA, for negotiation. (AR Tabs 40 and 43.)

103. Prior to any negotiations with AWS, the Agency decided to accept AWS's clarifying language to paragraph (a) of clause 152.204-706, as reflected by the SSA-approved, Select-to-Negotiation List: "The Sponsor agrees that 'only software developed and provided by AWS would be subject to this requirement.'" (AR Tab 43, Select to Negotiate List at 2.)[10]

---

[10] It bears note that the Agency fully incorporated 152.204-706 into the final C2S Contract. (Contract Documents SF 1449 Final at 15-16.) As part of the negotiations, the Agency agreed to

Footnote continued on next page

████████████████████████████████████████████
████████████████████████████████

104.    On February 12, 2013, the Agency held final negotiations with AWS and closed out all issues requiring negotiation.  (AR Tab 45, Final Negotiation Memo.)

105.    On February 14, 2013, the Agency and AWS executed the C2S Contract.

### The GAO Protest And Decision

106.    On February 13, 2013, the Contracting Officer notified IBM that the Agency had selected AWS for award.

107.    On February 19 and February 21, 2013, the Agency provided IBM with detailed post award debriefings.  (AR Tab 47, IBM Combined Full Comment Report; AR Tab 48, Debrief.)

108.    On February 26, 2013, IBM filed a protest with GAO challenging the award to AWS, and filed its first supplemental protest several days later.  Specifically, IBM challenged various aspects of the Agency's technical evaluation of IBM and past performance evaluation of AWS, claimed that the Agency's decision to adjust IBM's Scenario 5 price to provide a full year's worth of data analytics services (rather than a single run) amounted to an unstated criteria, and attacked the tradeoff analysis.  IBM did not challenge any AWS technical rating or object to all of its own technical weaknesses.

109.    With regard to its Scenario 5 price challenge, IBM contended that the only reasonable interpretation, given that Scenario 5 did not state performance specifications, was that Scenario 5 sought a solution for a single run of 100TB of data:

> By normalizing IBM's price, the agency imposed an unstated requirement to make
> each Data Analytics unit to be provided under Scenario 5 available for an entire

---

Footnote continued from previous page
accept AWS's clarification of paragraph (a) as a future construction of that paragraph of the clause.

year, rather than for just the duration of time necessary to process 100 TB of data. The RFP merely required offerors to propose solutions capable of processing 100 TB of data; nowhere did it require that each unit must be available for an entire year. RFP Amend. 4, Attach. 6. Thus, the RFP fundamentally left it to the offerors' discretion regarding how to propose a solution in response to Scenario 5.

\*\*\*

Moreover, in contrast to Scenario 5, Scenarios 1-4 and 6 have clear technical specifications for the size, performance, and configuration of the systems. Those specifications enabled the agency to evaluate and compare the price for each offeror's compliant solution for both reasonableness and value. In Scenario 5, however, there were no specifications that guided the offerors so that they would propose similarly performing systems. The only means to do so was to interpret the order to consist of one run of a 100 TB data set. The agency would then have a benchmark to compare each vendors offer to determine reasonableness.

(Supp. Prot. at 40-41.) Subsequently, in response to GAO questions to the Agency regarding the

Scenario 5 evaluation, IBM clarified that IBM objected to the Agency's interpretation of

Scenario 5, which caused the adjustment, and not to the calculated adjustment itself:

From the beginning, IBM's fundamental disagreement with the Agency regarding Scenario 5 has been that the Agency should not have "normalized" IBM's price at all. IBM does not challenge the specific calculations that the Agency used to adjust IBM's price, and that are described in the Agency's responses to questions 1 through 4 and 7. But the Agency never should have performed those calculations in the first place.

(IBM Comments on the Agency's Response to Normalization Questions at 1.) For relief, IBM

sought revised Scenario 5 instructions and a reopened competition. (Supp. Prot. at 42-43.)

110. On March 22, 2013, after the Agency held another debriefing with IBM, IBM

filed a second supplemental protest principally attacking ██████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████. (IBM 2d Supp. Prot.)

111. On April 12, 2013, IBM filed its third supplemental protest, claiming that the

Agency exceeded its authority when it conducted post-selection negotiations with AWS. Among

████████████████████████████████████████████████████████████████

other things, IBM claimed that the Agency unfairly relieved AWS of its obligation to meet the RFP stated security requirements set forth in clause 152.204-706 by accepting AWS's clarification that the paragraph (a) certification would only apply to "software developed and provided by AWS". (IBM 3d Supp. Prot. at 14-15; AR Tab 8-12, SF 1449 at 15 (clause 152.204-706(a)).)

112.    Throughout the GAO proceedings, the Agency (and AWS) demonstrated, *inter alia*, that IBM's challenges to Scenario 5 and the post-selection negotiations were untimely, failed to demonstrate prejudice, and lacked substantive merit in any event. (*See e.g.,* Agency Post Hearing Comments at 6-18 (noting that IBM had multiple opportunities to raise issue with Scenario 5 instructions and Agency's responses to IBM's Scenario 5 questions, and did not); *id.* at 20 (explaining that AWS software certification was irrelevant because other RFP requirements contractually obligated AWS to perform malicious code protection on all software involved in the C2S Program).)

113.    On May 14, 2013, GAO held a hearing on the following issues:

- Whether the agency reasonably assigned a deficiency and weakness to IBM's proposal regarding its ability to auto-scale customer provided applications.

- Whether, based on the information/instructions provided in the RFP, the agency reasonably normalized IBM's Scenario 5 price proposal upwards based on a 1-year duration at 100% duty cycle?

- Whether the agency's post-selection negotiations with AWS "exceeded the agency's authority" in that they resulted in coverage of "only software developed and provided by AWS would be subject to" the requirement(s) at RFP provision No. 152.204-706 (Security Requirements -- Software Certification).

(GAO 5/7/13 Notice of Hearing.)

114. On June 6, 2013, GAO sustained IBM's protest on two grounds, finding that the Agency: (a) failed to evaluate prices comparably under Scenario 5; and (b) waived, only for AWS during post-selection negotiations, a portion of the Software Security Commercial Clause, 152.204-706. (GAO Decision at 16, Ex. A.) GAO denied all other IBM protest challenges, including the Agency's assignment of a deficiency to IBM's proposal for IBM's inability to auto-scale and the assignment of its overall proposal as High Risk. (*See id.*)

115. In reviewing IBM's Scenario 5 allegations, GAO agreed with the Agency and AWS that IBM's challenge to the Agency's Scenario 5 interpretation was untimely. (*Id.* at 6, Ex. A.)

116. In reaching that conclusion, GAO observed that IBM, prior to submitting its initial proposal, asked detailed questions regarding the Scenario 5 instructions, seeking the anticipated average number of runs of each scenario type and how many analytic jobs were expected. (*Id.* at 6-7.) GAO also observed that, in responding to IBM's questions, the Agency reiterated its requirements that the "servers should be treated as operating on 100% duty cycle and should be priced out as simultaneous orders" (*id.* at 6), and that each "contractor should propose commercial best practices derived from their commercially available solutions to provide data analytics … to concurrent users from multiple organizations." (*Id.* at 7.)

117. GAO noted that IBM initially priced Scenario 5 at approximately ▇▇▇▇▇ based on continual data runs throughout the year, consistent with the approach taken by all other offerors. (*Id.*) But, nevertheless, in its FPR, "IBM (but not the other offerors) reduced its scenario 5 price to approximately ▇▇▇▇▇ based on a single run for each of the specified number of orders." (*Id.*)

- 37 -

118.    After citing to its bid protest regulations requiring protesters to object to solicitation defects prior to the initial time set for receipt of initial proposals, "when it is most practicable to take effective action against such defects," GAO stated:

> Here, by its own actions, IBM evidenced its recognition that the scenario 5 instructions were ambiguous as to the frequency of the expected 100 TB data runs. IBM requested clarification of the requirements in this regard and then, not having received meaningful clarification , first adopted one interpretation (that is, continual runs) in its initial proposal and then a different interpretation (a single run per order) in its FPR. Having chosen to compete despite its recognition of the patently ambiguous nature of the solicitation in this area, **IBM cannot now complain when the agency proceeds in a manner inconsistent with one of the possible interpretations and adjusts IBM's price to match the government's (and Amazon's apparent) interpretation of that requirement.**

(*Id.*)

119.    Inexplicably, however, GAO nevertheless sustained the Scenario 5 protest, finding that IBM's "challenge to the agency's calculation of an evaluated price for scenario 5 is not untimely." (*Id.* at 8.) IBM, however, did not challenge the Agency's calculation. (IBM Comments on the Agency's Response to Normalization Questions at 1.) IBM complained that no adjustment was warranted based on its incorrect interpretation of Scenario 5.

120.    GAO concluded that the Agency "lacked sufficient information to ensure that the proposals were evaluated on a common basis with respect to scenario 5," because the Agency did not specify for the offerors, or require information from the offerors, regarding how fast the proposed solution processes 100TB of data, i.e., how many times a solution could process that amount of information over the year period. (GAO Decision at 8, Ex. A.)

121.    That Scenario 5 did not specify the number of runs, or require information from offerors regarding the number of number of runs over the year ordering period *was apparent from the face of the RFP and an issue IBM realized prior to submitting its initial bid.*

122.    Thus, although GAO found that IBM had waived its right to challenge the Agency's interpretation of Scenario 5, GAO improperly recast IBM's protest as a price evaluation challenge and took issue with the Agency scaling up IBM's offered solution from the ███████ proposed to the 8760 hours required under the RFP. (*Id.* at 8-9.)

123.    The relief recommended by GAO demonstrates that GAO took issue with the ground rules of Scenario 5 and not the evaluation as GAO recommended that the Agency "reopen the competition and amend the RFP as necessary to ensure that proposals are prepared and evaluated on a common basis, consistent with the issues discussed in this decision." (*Id.* at 16.)

124.    GAO's rationale for sustaining IBM's contention that, by accepting AWS's clarifying language for 152.204-706(a), the Agency improperly relaxed a material requirement of the RFP, is equally arbitrary and a departure from the law and prior precedent.

125.    For instance, GAO observed that the RFP permitted offers to propose alternate, commercial term-based language to any provisions of the RFP (except for a few irrelevant identified exceptions). (*Id.* at 11 n.4.) GAO, however, ignored that this ground rule together with the RFP terms advising that the Agency could negotiate those commercial terms and conditions as part of the post-selection negotiation process (AR Tab 8-1, Final Instr. To Offerors at 9), rendered IBM's post-award objection to AWS and the Agency following that disclosed process untimely.

126.    Rather than address the un-timeliness of IBM's objection, GAO, without analysis, noted in a footnote that "while offerors were free to ask for changes, waiving a material term of the solicitation for only one of them, after the selection decision was made, was improper." (GAO Decision at 11 n.4, Ex. A.)

127.    GAO acknowledged that IBM availed itself of the RFP process for seeking changes and proposing additional terms consistent with the offeror's commercial practices, noting that IBM stated that it ███████████ ████████████████████████. (*Id.*) GAO nevertheless, concluded, without explanation, that IBM's ██████ revisions ████████████████ ████████████████████████████ ████████████████████████████ ████████████████, had no bearing on its conclusion that the Agency improperly waived a material term for AWS only and that IBM somehow suffered prejudiced. (*Id.*)

128.    With regard to prejudice, GAO, departing from its established precedent, stated: "In our view, IBM's assertion that the level of risk to the contractor was reduced by this modification is sufficient to establish prejudice." (*Id.*)

129.    Similarly, with regard to substance, the record does not support GAO's finding that AWS's requested clarification was material or the recommended relief. GAO dismissed all of the record evidence and *Agency* testimony establishing that AWS contractually committed to even stricter security controls than those set forth in 152.204-706(a), errantly concluding that the "record indicates that the modification of the RFP clause to the negotiated language materially reduced Amazon's obligations from those imposed in the RFP." (*Id.* at 10.)

130.    Contrary to GAO's finding, however, the record showed that the other paragraphs of clause 152.204-706, other RFP requirements which incorporate security controls in response to law and regulations, and other AWS proposal sections responding to those requirements, were incorporated into the AWS C2S Contract, and obligate AWS to implement stricter security controls to guard against and check for malicious software and to report such findings to the Agency.

████████████████████████████████████████████████

131.   AWS's proposed clarification to 152.204-706 was to the scope of "software to be provided" in paragraph (a) of the clause.   It did not affect any other provision of the clause, including paragraph (b) which states: "The Contractor shall immediately inform the Contracting Officer when it has a reasonable suspicion that any software provided or returned, to be provided or returned, or associated with the production may cause the *harm* described in paragraph (a) above." (AR Tab 8-12, SF 1449 at 15 (emphasis added).)

132.   Moreover, AWS contractually committed to perform malicious code and other system vulnerability protections, and to report all security issues to the Agency in its Systems Security Plan. (C2S Contract Attchmt 12 at 71.) The following are just a few examples:



---

[11] The POA&M is the "Plan Of Action & Milestones," a key document that describes the plans: (i) to correct any weaknesses or deficiencies in the security controls noted during the assessment; and (ii) to address the residual vulnerabilities in the information system. *See* NIST 800-37 Rev.1 at 34, F-2 available at http://csrc.nist.gov/publications/nistpubs/800-37-rev1/sp800-37-rev1-final.pdf; NIST 800-18 Rev. 1 at 3-4, available at http://csrc.nist.gov/publications/nistpubs/800-18-Rev1/sp800-18-Rev1-final.pdf ("The results of a security certification are used to reassess the risks, develop the plan of action and milestones (POA&Ms) which are required to track remedial actions, and update the system security plan, thus providing the factual basis for an authorizing official to render a security accreditation decision.").) The POA&M is shared with the C2S PMO at least quarterly or as needed (i.e., when new weaknesses are identified or remediations are taken to close any existing POA&M items). NIST 800-37 Rev. 1 at 35 ("Providing orderly, disciplined, and timely updates to the security plan, security assessment report, and plan of

Footnote continued on next page



(*Id.*)

133. Further, in its post-hearing brief, AWS mooted the issue, noting that, if GAO were to find that the Agency could not legally accept AWS's clarifying reading of 152.204-706(a), the appropriate remedy would be to direct the reopening of post-selection negotiations, *and, in such an event, AWS would waive the requested clarification language.*

134. Despite finding that the problem lay with the Agency accepting the AWS proposed clarification during post-selection negotiations (and not with the proposed clarification itself), GAO directed that the Agency conduct discussions with offerors, obtain and evaluate new proposals, and make a new source selection decision. (GAO Decision at 16, Ex. A.) A proper remedy, however, would have been to restore the parties to post-selection negotiations and permit the Agency to reject the language and finalize award with AWS.

**The Corrective Action In Response To GAO's Decision**

---

Footnote continued from previous page
action and milestones on an ongoing basis, supports the concept of near real-time risk management and ongoing authorization."); *id.* at 39-40 (addressing updates).

- 42 -

135.     On July 9, 2013, the Agency issued Amendment 5 to the RFP, implementing corrective action in response to GAO's decision.

136.     Amendment 5 reopens the competition and sets August 9, 2013 as the deadline for new FPRs. (*See* Letter from Contracting Officer dated 7/9/13.) Pursuant to the Agency's instructions, the FPR submissions shall include updates to the Technical/Management, Price, and Contract volumes. Offerors may not submit revised Past Performance volumes. Offerors may submit Security volume updates, as necessary.

137.     The FPR instructions indicate that each offeror shall present its capabilities again in a new Demonstration/Oral Presentation during the week following the FPR submission deadline. (*See* Letter from Contracting Officer dated 7/9/13.) All prior evaluation results for the Demonstration/Oral Presentation (evaluation criterion 2.1.1.) "will be dismissed." (*Id.*)

138.     In the Contracting Officer letter explaining Amendment 5, the Agency disclosed the final scores by evaluation factor, and proposed and evaluated prices, for IBM and AWS, respectively.

139.     Amendment 5 removes clause 152.204-706, because "it is redundant to other RFP requirements (e.g., ICD-503 compliance)" -- the very point the Agency supported and argued before GAO. (RFP Edits with Rationale at 1.)

140.     Amendment 5 also revises the Pricing Template to "clarify the duration requirements for the scenarios" and to include for Scenario 5 "information relating to the data set being analyzed and to time bound the performance of the analysis." (*Id.*)

141.     On July 19, 2013, the Agency issued Amendment 6 to the RFP, which extends the deadline for revised FPRs to August 16, 2013, calls on the offerors to also submit updates to the Past Performance volumes, and moves the Demonstration/Oral Presentations to early September

2013. (*See* Letter from Contracting Officer dated 7/19/13.) For the Past Performance updates, the Agency advised that "[u]pdated references may include updates to previously submitted references as well as new references." (*Id.* at 1.)

### Harm To AWS And The Public Interest And Lack Of Harm To The Agency

142. A preliminary and permanent injunction is appropriate and necessary to prevent imminent and irreparable harm to AWS and to enforce AWS's legal rights.

143. If the Court does not declare the corrective action unlawful and enjoin the action, AWS's current lawful C2S Contract award will effectively be nullified, AWS unnecessarily will have to expend the time, effort, and expense recompeting for the contract that AWS already lawfully won, AWS's performance and income related to the awarded contract will be unnecessarily delayed, and AWS's competitive position will be compromised by the prior debriefing disclosures of AWS's price and ratings to its competitors.

144. The Agency will suffer no harm through the issuance of the requested injunctive relief. The Agency's initial award decision comports with the RFP and the law, a fact which both Agency and AWS counsel established (even if disregarded) before GAO. A finding in AWS's favor supports the massive investment of time and expense expended by the Agency and undone by GAO's irrational and unlawful decision and recommendation.

145. No other offeror will suffer cognizable harm through the issuance of the requested injunctive relief.

146. The public has a strong and overriding interest in maintaining the integrity of the procurement process. If not corrected, the GAO decision (which breaks from both Court and GAO precedent) will frustrate the understanding of timeliness, prejudice, and standing -- critical, well-established legal principles.

## COUNT I
## THE AGENCY'S DECISION TO TAKE CORRECTIVE ACTION BASED ON GAO'S DECISION WAS ARBITRARY AND UNLAWFUL BECAUSE GAO'S DECISION WAS ARBITRARY AND UNLAWFUL

147. AWS incorporates paragraphs 1 through 146 of the Complaint by reference.

148. A justiciable controversy exists related to the propriety of the original competition, the GAO decision, and the Agency's corrective action based on the GAO decision.

149. Where an agency takes corrective action based on a GAO recommendation, the Court must test the rationale underlying the GAO decision. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011). If an agency implements a GAO recommendation that is itself irrational or unlawful, the Court will find the Agency's corrective action implementation irrational and unlawful. *See e.g., Turner Constr. Co. v. United States*, 94 Fed. Cl. 563, 579, 583 (2010) (granting judgment for awardee and restoring contract to awardee where GAO decision applied wrong standard of review and deviated from precedent, stating: "because the GAO decision was irrational, the Army was not justified in relying on it."), *aff'd, Turner Constr. Co. v. United States*, 645 F.3d 1377 (Fed Cir. 2011).[12] In assessing the rationality of GAO's decision, the Court must give due regard to the fundamental premise that Contracting Officers "are given broad discretion in their evaluation of bids. . . [and] when an officer's decision is reasonable, neither a court nor the GAO may substitute its judgment for that of the agency." *Turner Constr.*

---

[12] *See also Sys. Appl'n & Techs., Inc. v. United States,* 100 Fed. Cl. 687, 720-22 (2011) (enjoining Army from implementing corrective action based on irrational GAO statements); *Grunley Walsh Int'l v. United States*, 78 Fed. Cl. 35, 44 (2007) (holding Department of State withdrawal of plaintiff's pre-qualification to bid based on GAO misreading of a statute arbitrary and capricious); *Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281, 296 (1998) (finding GAO decision based on erroneous interpretation of FAR and GAO precedent irrational); *Firth Constr. Co. v United States*, 36 Fed. Cl. 268, 271-72, 276-77 (1996) (finding GAO decision irrational that departed from own precedent and failed to adequately consider applicable procurement regulations).

*Co.*, 645 F.3d at 1383. Moreover, the Court "has the duty to determine independently any questions of law, such as the correct interpretation of the Solicitation, that must be addressed in bid protests." *See CBY Design Builders v. United States*, 105 Fed. Cl. 303, 342 (2012).

150. The Agency here took corrective action in response to GAO's June 6, 2013 decision. For a number of independent reasons, GAO's decision contravenes applicable law, departs from established precedent, and ignores critical facts, rendering the associated corrective action decision by the Agency arbitrary, irrational, and contrary to the law.

151. First, GAO's decision to address the merits of IBM's protest *without* first considering whether IBM had standing as an interested party violates both the statutory authority under which GAO operates and well-established law. The Agency asserted that IBM lacked standing to advance its protest based on the IBM auto-scaling deficiency. (Agency April 1, 2013 Legal Mem. at 11; *see also* AR Tab 8-2, Final Eval. Criteria at 52.212-2(a) (RFP providing that Government will award a contract resulting from this solicitation to the responsible offeror *whose offer conforming to the solicitation* will be most advantageous to the Government, price and other factors considered.") (emphasis added).) AWS repeatedly joined in this black letter legal request that GAO dismiss the IBM protest upon affirming the IBM auto-scaling deficiency. (*See, e.g.*, AWS Post-Hearing Comments at 2.) Although GAO affirmed the Agency's deficiency finding based on IBM's failure to meet the RFP's minimum requirements (GAO Decision at 12-14, Ex. A), GAO never addressed IBM's consequent lack of standing as an interested party for the remainder of its protest challenges.

152. An offeror which submits an otherwise unacceptable proposal lacks standing to pursue a protest as a matter of statute, regulation, and precedent. *See* 31 U.S.C. § 3552; 4 C.F.R. § 21.1(a); *United States v. Int'l Bus. Machs. Corp.*, 892 F.2d 1006, 1012 (Fed. Cir. 1989)

(vacating Board protest decision, noting "[a] nonresponsive bidder is the epitome of one who lacks a direct economic interest."); *Dismas Charities, Inc. v. United States*, 75 Fed. Cl. 59 (2007) (disappointed bidder lacked standing to bring bid protest due to non-compliant proposal which included a 240-day development schedule, instead of the RFP-required 120-day schedule); *Tetra Tech Tesoro, Inc.*, B-403797, Dec. 14, 2010, 2011 CPD ¶ 7 ("Since the protester is not in line for award given the deficiency received, the protester is not an interested party to raise its other protest challenges, and we will not consider them here.") When GAO acts in violation of law, the act lacks a rational basis. *Sys. Appl'n*, 100 Fed. Cl. at 714. GAO's failure to address IBM's lack of standing and dismiss the remainder of the IBM protest once it affirmed the auto-scaling deficiency renders the corrective action recommendation unlawful.

153. Second, with respect to Scenario 5, the law obliged GAO to dismiss IBM's entire argument as untimely. *See* 31 U.S.C. §§ 3552(a), 3555(a); 4 C.F.R. § 21.5(e) (GAO "shall" dismiss a protest that is not timely filed); *Sys. Appl'n*, 100 Fed. Cl. at 713 ("GAO may not entertain untimely protests because they are not timely filed in accordance with the governing statutes."). Offerors cannot sit on their rights to challenge what they believe is an unfair or incomplete solicitation requirement, "roll the dice and see if they receive award [sic], and then if unsuccessful, claim the solicitation was infirm." *Blue & Gold Fleet L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007) (quotation omitted); *see also Stratos Mobile Networks USA LLC v. United States*, 213 F.3d 1375, 1380-81 (Fed. Cir. 2000) (finding any ambiguity in price evaluation language patent and imposing duty on contractor to seek clarification); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 998 (Fed. Cir. 1996) (protester's failure to seek clarification of patently ambiguous answer to another offeror's inquiry about provision prohibited protester from arguing that its interpretation of the provision is correct). Offerors also cannot

- 47 -

recast a solicitation's infirmities as evaluation challenges to avoid the timeliness bar: "While Blue & Gold characterizes this as a challenge to the evaluation of Hornblower's proposal, we agree with the Court of Federal Claims that this argument is properly characterized as a challenge to the terms of the solicitation." *Blue & Gold*, 492 F.3d at 1313.

154.    GAO correctly found IBM's challenges to the Scenario 5 "instructions" untimely, noting: "Having chosen to compete despite its recognition of the patently ambiguous nature of the solicitation in this area, IBM cannot now complain when the agency proceeds in a manner inconsistent with one of the possible interpretations and adjusts IBM's price to match the government's (and Amazon's apparent) interpretation of the requirement." (GAO Decision at 7, Ex. A.)  Ignoring its own findings and the law, GAO then sustained IBM's Scenario 5 protest declaring that the Agency "lacked sufficient information to ensure that the proposals were evaluated on a common basis with respect to scenario 5," because the Agency did not specify how fast the proposed solutions must process 100TB of data.  (*Id.* at 8.)  But the fact that Scenario 5 did not specify the number of runs over the year period or specify a processing speed *was apparent from the face of the RFP*, as IBM's own witness acknowledged and the bidders' questions and Agency responses further evidence.  To that end and tellingly, *Aalco Forwarding, Inc., et al.*, B-27741.5, Mar. 11, 1998, 98-1 CPD ¶ 87, the decision cited by GAO for the proposition that "an agency's chosen method of evaluation must include some reasonable, common basis for evaluation or comparing the relative costs of proposals" (*id.* at 8), is a *preaward* protest challenging the RFP's terms.

155.    GAO's decision to recast IBM's argument as a price evaluation challenge cannot somehow make the argument timely.  *See e.g., Phoenix Mgmt., Inc. v. United States,* 107 Fed. Cl. 58, 71 (2012) ("although Phoenix characterizes the … Complaint as a challenge to the

████████████████████████████████████████

Agency's evaluation of the proposals, it actually challenges the Solicitation and the Agency's decision not to evaluate the proposals on the basis of the proposed workers' commitment); *Textron, Inc. v. United States,* 74 Fed. Cl. 277, 309-10 (2006) (concluding that when essence of challenge goes to the "basic approach to this acquisition" it has been waived if not attacked prior to submitting a proposal).[13]

156.    The relief directed by GAO further exposes the Scenario 5 issue as an improperly recast, pre-award protest.   The proper remedy for a timely-filed solicitation defect protest is to amend the solicitation.   The correct relief for a post-award price evaluation argument is a reevaluation of price.  GAO, here, directed the Agency to "reopen the competition and amend the RFP as necessary to ensure that proposals are prepared and evaluated on a common basis, consistent with the issues discussed in this decision." (GAO Decision at 16, Ex. A.)[14]  The IBM Scenario 5 argument and everything related to it was untimely filed rendering GAO's decision and the corrective action unlawful and arbitrary.

157.    Third, GAO's substantive concern with respect to Scenario 5 (untimely as it is) undermines the law of commercial item procurement which (by necessity) does *not* require an agency to include detailed specifications: "The head of an agency shall ensure that, to the maximum extent practicable—(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of— (A) functions to be performed; (B) performance required; **or** (C) essential physical characteristics." 10 U.S.C. § 2377(a).  In its decision, GAO

---

[13] Moreover, as related to GAO's assertion that IBM had challenged the price evaluation associated with Scenario 5, IBM did not.  (IBM Comments on the Agency's Response to Normalization Questions at 1.)

[14] To the extent that GAO was not objecting to the ground rules the Agency set for Scenario 5, then GAO's recommended relief is overly broad, further undermining the rationality of the decision.

substituted its judgment for that of the Agency's technical experts by holding that the Agency had to circumscribe the offeror's "best commercial practices" with specific performance characteristics regarding how fast the offeror would process 100TB of data.

158. But as the Agency's cloud computing expert explained, cloud computing is among the most complex commercial products the Government may ever buy. Cloud computing systems involve *many unique characteristics* of which speed is but one. Indeed, with respect to Scenario 5, the Agency expert noted numerous items that could impact performance (much broader than speed alone) including the amount of locally available storage, the amount of memory on the systems, the amount of virtual computer cores proposed, and more. In this regard, the Agency's *expert* witness, the drafter of Scenario 5, testified that the Agency intentionally did not specify performance characteristics, because the Agency was "interested in taking advantage of the expertise that [the offerors] could provide." (Holloway Test. at 285:7-16, 286:12-287:18.) The Agency set forth the function to be performed and directed each offeror to propose and price its best commercial practice to satisfy that need. The witness explained:

> Again, the idea was these -- these offerors, they do this as a primary line of business. They have very high technical expertise and competence in the area of this particular platform service specifically, big data, analytics on big data, is something there's a lot of research going into, and a lot of really unique, very specialized, highly -- highly capable solutions exist. And we were looking to -- we were saying, okay, here's the framework you have to operate in.
>
> We want you to come up with your commercial best practice and propose that in order for the government to take advantage of it, based on the framework of the scenario.
>
> And again, without hamstringing or biasing the contract in any way because we were too specific one way or the other, because again, this is a platform service that has very unique differing diverse functional characteristics between offerors, and that's why we weren't as specific here as we were in the other scenarios. Because the other scenarios are more standard and more common.

(*Id.* at 288:5-289:4.)

159.    The Agency had valid reasons for designing Scenario 5 as it did and tremendous

discretion to do so without GAO interference. *Adventure Tech, Inc.—Recon. & Entitlement to*

*Costs*, B-253520, B-253520.2, B-253520.3, Feb. 9, 1994, 94-1 CPD ¶ 105 (noting discretion

provided by Congress to craft commercial item specifications in various ways and denying *pre-*

*award* challenge to commercial item solicitation where protester claimed that agency had not

provided "any guidance as to the minimum standards for 'waterproofness' and moisture vapor

permeability, and fail[ed] to adequately inform bidders of the agency's minimum needs with

regard to design and construction, pocket sizes, or garment sizes.")

160.    Fourth, GAO's Scenario 5 decision does not address the manifest lack of

competitive prejudice to IBM, a necessity before any forum may sustain a bid protest, rendering

GAO's decision irrational as a matter of law.    The Agency's good-faith attempt to adjust IBM's

otherwise non-compliant proposal *could not* have prejudiced IBM.    Without the adjustment, the

Agency would have had to exclude IBM from the competition.    Moreover, as the Agency

repeatedly demonstrated to GAO, had the Agency adjusted AWS down to the single run

approach bid by IBM through gamesmanship (rather than the continuous operations approach

called out by the RFP and proposed by all other offerors), the IBM cost advantage would have

decreased substantially.    The adjustment the Agency did make, calculated by ███████████

███████████████████████████████████████, yielded an FPR Scenario 5 evaluated

price █████████████████████████████████████████████████████████
████████████████████████████████████.[15]

161.　Fifth, with respect to the post-selection negotiations ground, GAO also failed to consider the untimeliness of the IBM allegations despite GAO's statutory mandate and the repeated argument by the Agency and AWS.

162.　Prior to and during the competition, the Agency made clear to IBM (and all offerors) that the offerors could propose revisions to contract terms: "the offerors may include commercial license/terms and conditions." (AR Tab 8-1, Final Instr. to Offerors at 9.) The Agency likewise identified the five types of clauses that it would *not* accept, leaving clause 154.204-706 Security Requirements -- Software Certification among the provisions that offerors could propose to modify in accordance with commercial practices. (*Id.*; Ross K. Test. at 475:3-476:9.) Moreover, the Agency advised all offerors that it intended to select an offeror for "final negotiations." (AR Tab 8-12, SF 1449 at 47.) The Agency even advised IBM specifically during discussions that the Agency "reserves the right to negotiate all commercial terms and

---

[15] IBM's protest-inspired prejudice claims that it would have bid approximately ███████ for Scenario 5 had it understood the Agency's instructions lack credible support. As noted, IBM priced Scenario 5 at ██ ████████ in its initial proposal when IBM followed the Agency's Scenario 5 instructions. Moreover, IBM failed to demonstrate that a ████████ Scenario 5 price could have created a substantial chance of award in any event. The Agency had determined that AWS merited a $54 million premium due to AWS's vast technical superiority, *IBM's technical deficiency* and weaknesses, and the ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████. In any event, GAO did not address whether IBM suffered prejudice as a result of the Scenario 5 evaluation, despite extensive argument by the Agency and AWS.

████████████████████████████████████████████████████████████

conditions, if selected for award, under the select to negotiate process outlined in clause 152.215-729AI Agency Alternate to FAR Provision 52.215-1 Alternate I (FEB 2011)." (AR Tab 29-2, IBM Follow-up Questions and Responses at 10 (starting nine pages of discussions on IBM's commercial terms).) The ███████ revisions proposed by IBM ███████████████ evidence that IBM fully understood these ground rules. To the extent that IBM believed that these ground rules left the competition unfair, the law prohibited IBM from competing first and complaining later; yet that is what IBM has done. *Burney v. United States*, 499 F. App'x 32 (Fed. Cir. 2012) (post award protest untimely where solicitation reserved right for government to act as it did); 4 C.F.R. § 21.2(a)(1).

163.    Sixth, GAO wrongly concluded that IBM, which took full advantage of the commercial terms/select-to-negotiate process, proposing qualifications and clarifications to FAR clauses, Agency clauses, pricing provisions, and liability provisions, had standing to advance its objection to the AWS clarification to paragraph (a) of 152.204-706. (AR Tab 69, IBM Contract FPR at 5-2 to 5-21; Ross K. Test. at 478:3-479:11.)

164.    Among other proposed contract revisions, IBM ████████████████████ ███████████████████████. (AR Tab 69, IBM Contract FPR at 5-5.) IBM also proposed to ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ (*Id.* at 5-3.) IBM only ██████████████████████████ ██████████████████████ (*Id.* at 5-3 to 5-5.)

165.    ██████████████████████████████████████████████████ ████████████████  ████████████████████████████████████ ██████████████████

- 53 -

████████████████████████████████████████████████████ ████████████████████████████████████████████



(*Id.* at 5-15; *see also* AR Tab 69, IBM Contract FPR at 5-8 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.) In addition, ███████████████

risk by ███████████████████████████████████████



(*Id.* at 5-17.) And IBM, through proposing additional contractual terms, ████████████

████████████████. (*Id.*)

166.    In addressing this argument, GAO states: "While offerors were free to ask for

changes, waiving a material term of the solicitation for only one of them, after the selection

decision was made, was improper." (GAO Decision at 11 n. 4, Ex. A.) But precedent provides

that a protester may not advance an argument that, if accepted, would leave its own proposal

unacceptable. *See e.g., Intelligent Envirs.*, B-256170, B-256170.2, Nov. 28, 1994, 94-2 CPD ¶

210 (denying protest that "awardee's proposal is technically unacceptable" where protester

advanced "an unreasonably restrictive reading of solicitation requirements ... under which

interpretation of the protester's own proposal is also technically unacceptable"); *Schat

Watercraft, Inc.*, B-244175, June 17, 1991, 91-1 CPD ¶ 574 (dismissing protest where protester

█████████████████████████████████████████████████

"under its interpretation of the applicable statutory requirements, its own proposal was ineligible for award").

167.    Seventh, even if IBM had timely and properly made its argument (which it did not), GAO's apparent determination that the Agency could *not* negotiate Clause 152.204-706 is legally incorrect.    Clause 152.204-706, which addresses *the provision of software under a contract*, is a license term.    FAR 12.212 provides: "Commercial computer software ... *shall be acquired under licenses customarily provided to the public* to the extent such licenses are consistent with Federal law and otherwise satisfy the Government's needs."    *See also* FAR 27.405-3(a) ("Section 12.212 sets forth the guidance for the acquisition of commercial computer software and states that commercial computer software ... shall be acquired under licenses customarily provided to the public to the extent the license is consistent with Federal law and otherwise satisfies the Government's needs.... If greater rights than the minimum rights set forth in the clause at 52.227-19 are needed, or lesser rights are to be acquired, they shall be negotiated and set forth in the contract.").    In this regard, competitors for commercial item IT contracts routinely submit proposals based on their *own commercial licenses*.    The negotiation and acceptance of such terms does *not* constitute a relaxation of requirements and is not improper.

168.    Even were such negotiations improper, AWS's clarification of "software to be provided" to "software developed and provided by AWS" was not a material change because it did not alter AWS's contractual obligations with regard to software security and incident reporting.    The other paragraphs of 152.204-706, other RFP requirements, and AWS proposal sections responding to those requirements, all incorporated into the C2S Contract, obligate AWS to implement security controls that are stricter than those set forth in 152.204-706(a) to guard against and check for malicious software.    Moreover, AWS agreed to waive its clarification

- 55 -

during the GAO protest rendering the entire issue moot: "Further underscoring the immateriality of the clarification, AWS will waive its proposed commercial term clarification to 152.204-706(a), if requested, rendering the matter moot in any event." (AWS Post Hearing Brief at 5.)

169.   Eighth, GAO's holding that "IBM's assertion that the level of risk to the contractor was reduced by [AWS's proposed] modification is sufficient to establish prejudice," adopts and applies the wrong legal standard.  The law of prejudice requires IBM to demonstrate that, but for the evaluation error, IBM had a substantial chance for award. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, ___ F.3d ___, 2013 WL 3185536, *7 (Fed. Cir. June 25, 2013).   Bare assertions regarding the level of risk purportedly faced by AWS have (at most) tangential relevance to such a determination.  What matters is whether IBM demonstrated (specifically) that IBM would have altered its proposal enough to have a substantial chance of winning had IBM known that it could have proposed the same clarification to paragraph (a) of clause 152.204-706. *See e.g., Armed Forces Hospitality, LLC*, B-98978.2, B-298978.3, Oct. 1, 2009, 2009 CPD ¶ 192 (denying protest where protester "has not demonstrated that alleged relaxed requirements would have altered its submission to its competitive advantage (i.e., that it would have become the successful offeror)"); *Gulf Copper Ship Repair, Inc.*, B-292431, Aug. 27, 2003, 2003 CPD ¶ 155 (same).  GAO never asked, much less established, that, but for this purported 152.204-706(a) error, IBM would have had a substantial chance for award.  GAO's decision, accordingly, is fatally flawed.

170.   Had GAO applied the right standard, it could not have sustained IBM's 152.204-706(a) protest.  IBM's Marginal rating deficiencies, significant weaknesses, High Risk, and Moderate past performance had nothing to do with 154.204-706(a).  Moreover, IBM did not present any specific evidence regarding how it would have revised its proposal, nor could it.

- 56 -

IBM was fully aware that it could propose to revise all but a handful of provisions and ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ IBM understood the scope of what it could propose. No basis exists to believe that IBM (which proposed terms ████████ ████████████████████████████████) would have somehow bid differently had it known that the Agency would consider tweaking third party software statements in 152.204-706(a) -- a fact that IBM did in fact know. Bare, rank assertions that an awardee's level of risk was reduced fall far short of the prejudice mark in all forums.

171.    The Agency's decision to take corrective action in response to IBM's untimely and meritless protests and the irrational GAO decision is arbitrary and capricious and in violation of the Competition in Contracting Act. There is no timely protest of Agency error, no interested party, or any illegality by the Agency that permits reopening the competition, new proposals, and a new award decision.

172.    But for the Agency's decision to follow GAO's irrational and unlawful recommendation and to take corrective action based thereon, AWS would be performing the C2S Contract now as the rightful awardee.

WHEREFORE, AWS requests that the Court declare: (i) GAO's June 6, 2013 decision and the Agency's corrective action decisions based thereon irrational and contrary to the law; and (ii) the C2S Contract award to AWS under the RFP valid and not subject to corrective action based on IBM's untimely and meritless GAO protest. AWS further requests that the Court issue injunctive relief to prevent the Agency from taking the corrective action set forth in the Agency's July 9, 2013 and July 19, 2013 amendments to the RFP and from otherwise interfering with AWS's performance of the C2S Contract awarded on February 14, 2013.

## COUNT II
## ALTERNATIVELY, TO THE EXTENT GAO WAS CORRECT, NO RATIONAL BASIS FOR EXISTS THE SWEEPING CORRECTIVE ACTION IMPLEMENTED

173.    Paragraphs 1 through 146 of the Complaint are incorporated by reference herein.

174.    The Court has jurisdiction to review the reasonableness of the Agency's corrective action. *Chapman Law Firm v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007).

175.    An agency's chosen corrective action must be "reasonable under the circumstances." *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 151 (2010). "To be reasonable, the agency's corrective action must be rationally related to the defect to be corrected," *id.* at 151, and the "reason for the corrective action must be supported by the evidence in the record." *Id.* Because the reopening of a procurement after the disclosure of the awardee's prices and ratings necessarily compromises the integrity of the competitive procurement process, a federal agency must narrowly tailor its corrective action to meet the defect identified. *Id.* at 154.

176.    The Agency's corrective action consists of reopening discussions with the offerors regarding *all* identified concerns with the offerors' prior FPRs and calling for revised FPRs in all proposal areas (Technical/Management, Past Performance, Price, Contract).

177.    The Agency's decision to take the sweeping corrective action identified in its July 9, 2013 and July 19, 2013 letters undermines fair competition as it exceeds the action necessary to remedy the purported defects identified by GAO.

178.    GAO identified two purported defects: (a) GAO "found the [Scenario 5] price evaluation to be unreasonable" (GAO Decision at 8, Ex. A); and (b) GAO declared that the Agency "materially relaxed the solicitation's requirements for Amazon without affording the

other offerors an opportunity to propose to the modified requirements," by accepting AWS's proposed clarification to 152.204-706(a). (*Id.* at 12.)

179. With respect to the purportedly flawed Scenario 5 price evaluation, the *only* appropriate corrective action is a revised price evaluation: "this Court has rejected corrective action to resolicit proposals because of a perceived evaluation error." *Sheridan*, 95 Fed. Cl. at 153; *see also Delaney Constr. Corp. v. United States*, 56 Fed. Cl. 470, 476 (2003); *MCII Generator & Elec. v. United States*, 2002 WL 32126244 (Fed. Cl. Mar. 18, 2002). GAO, exposing the true nature of its concerns as related to the RFP terms, asserted that Scenario 5 did not provide sufficient direction to, or solicit adequate information from, the offerors. (GAO Decision at 8-9, Ex. A.) Even accepting this untimely RFP critique, Scenario 5 is a stand-alone pricing scenario, unrelated to any technical proposal section, demonstration initiative, or other pricing scenario. Accordingly, to the extent that Scenario 5 did not provide sufficient direction to, or solicit adequate information from, the offerors as GAO found, proper relief would involve the amendment of Scenario 5, the submission of revised Scenario 5 price proposals, and a new source selection decision.

180. With respect to *post-selection negotiations*, GAO asserted that: "While offerors were free to ask for changes, waiving a material term of the solicitation for only one of them, after the selection decision was made, was improper." (GAO Decision at 11 n.4.) Given that *both* offerors were free to (and did) propose all manner of commercial terms including as related to third party software, the only error lay (if at all) in the Agency's acceptance of the AWS clarification to 152.204-706(a) during post selection negotiations. The correction of this purported defect involves the rejection of AWS's proposed clarification in any subsequent post-selection negotiations with AWS -- a clarification AWS agreed to forgo some time ago. Any

broader corrective action is patently arbitrary. *See Delaney Constr. Corp.*, 56 Fed. Cl. at 476 (finding corrective action involving amendment of solicitation and call for revised price proposals to address a missing clause arbitrary and noting that "[n]o public interest purpose has been established which would support trashing the disclosed prices obtained on the basis of full and open competition, in favor of obtaining new prices as a result of adding a contract clause....").

181.    The Agency's decision to reopen the competition calling for updates to all proposal volumes and conducting wholesale discussions in response to two limited GAO findings creates a fundamentally unfair procurement. *Sheridan Corp.*, 95 Fed. Cl. at 151 ("Simply put, the corrective action must target the identified defect. Here, the agency's concern related to evaluation of the proposals.... Resoliciting new proposals was not a rational corrective action.")

182.    The Agency has provided IBM extensive information about its prior evaluation of IBM's December 2012 FPR and also has shared AWS's price and evaluation scores through post award debriefings, debriefing slides, and a copy of the IBM Combined Full Comment Report (a document detailing the consensus evaluation of IBM under all evaluation factors). (AR Tabs 47 and 48.)

183.    The broad corrective action announced in Amendments 5 and 6 to the RFP compromises the integrity of the procurement system.

184.    Even if the Court should find some corrective action warranted, it should not permit IBM the undeserved windfall opportunity to make its otherwise uncompetitive, materially-deficient proposal competitive now that it has AWS's price and ratings in hand. Such

a result, which materially harms one competitor for the benefit of another, does not foster competition.

WHEREAS, AWS requests that the Court (a) declare that the Agency's corrective action is overbroad, unreasonable, and in violation of federal law and regulation, and (b) issue preliminary and permanent injunctive relief enjoining resubmission of proposals beyond Scenario 5 and limiting the relief associated with  RFP Commercial Clause § 152.204-706(a).

### PRAYER FOR RELIEF

WHEREFORE, AWS respectfully requests that this Court:

A.   Issue the declaratory and injunctive relief requested above; and

B.   Provide such other and further relief as the Court deems just and proper.

Dated:  July 24, 2013

Respectfully submitted,

ARNOLD & PORTER LLP

Of Counsel:

Kara L. Daniels
Lauren J. Schlanger
Steffen Jacobsen
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004

_____
Craig A. Holman
555 Twelfth Street, N.W.
Washington, D.C. 20004
Tel:  202-942-5722
Fax: 202-942-5999

*Counsel of Record for Plaintiff*
*Amazon Web Services, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of July 2013, I caused a true and correct copy of the

Complaint to be served on:

Steven M. Mager
Senior Trial Counsel
Department of Justice
1100 L Street, N.W.
Washington, D.C.  20530
steven.mager@usdoj.gov
(by hand and electronic delivery)


Arthur L. Passar
Attorney, Contract Law Division
Office of General Counsel
Central Intelligence Agency
Washington, D.C. 20505
arthulp@ucia.gov
(by electronic delivery)


_____

Craig A. Holman



# Exhibit A

**G A O**
Accountability • Integrity • Reliability

**Comptroller General
of the United States**

United States Government Accountability Office
Washington, DC 20548

**DOCUMENT FOR PUBLIC RELEASE**
The decision issued on the date below was subject to
a GAO Protective Order. This redacted version has
been approved for public release.

# Decision

**Matter of:**  IBM-U.S. Federal

**File:**  B-407073.3; B-407073.4; B-407073.5; B-407073.6

**Date:**  June 6, 2013

Jason A. Carey, Esq., Luke W. Meier, Esq., Katherine M. John, Esq., Kevin T.
Barnett, Esq., and John W. Sorrenti, Esq., McKenna Long & Aldridge LLP, for the
protester.
Craig A. Holman, Esq., Kara L. Daniels, Esq., Lauren J. Schlanger, Esq., and
Steffen G. Jacobsen, Esq., Arnold & Porter LLP, for Amazon Web Services, Inc., an
intervenor.
Edwin G. Doster, Esq., Avi M. Baldinger, Esq., and Arthur Passar, Esq., Central
Intelligence Agency, for the agency.
Paul E. Jordan, Esq., and David A. Ashen, Esq., Office of the General Counsel,
GAO, participated in the preparation of the decision.

## DIGEST

1.  Protest is sustained where agency's evaluation of protester's price under one of
the solicitation's price scenarios was not calculated in such a way as to result in
evaluation on a common basis.

2.  Protest is sustained where, during post-selection negotiations, which were
anticipated by the solicitation, the agency materially relaxed a solicitation term
regarding software certification; relaxing this term for only the awardee resulted in a
failure to treat offerors equally.

3.  Protester's contention that the agency's evaluation of the past performance of a
commercial cloud services provider improperly ignored information from news
reports of service outages is denied where the evaluators were aware of the
reports, but concluded that the reports lacked sufficient detail concerning the
offeror's adherence to service level agreements to justify downgrading the offeror's
past performance rating.

## DECISION

IBM U.S. Federal (IBM), of Bethesda, Maryland, protests the Central Intelligence

Agency's (CIA) award of a contract to Amazon Web Services, Inc., of Seattle, Washington, under request for proposals (RFP) No. 2012-12041000001, for commercial cloud services (C2S). IBM challenges the evaluation of proposals and the selection decision.

We sustain the protest in part and deny it in part.

BACKGROUND

The RFP contemplated the award, on a "best value" basis, of a single fixed-price indefinite-delivery/indefinite-quantity (ID/IQ) contract for commercially-managed cloud computing services for the Intelligence Community to be provided through task orders. The contemplated ID/IQ contract was to include a 270-day period to achieve initial operating capability, a 4-year base ordering period, a 3-year option, and a 2-year option, with a maximum value of $600 million over the base period.

According to the Federal Cloud Computing Strategy, "cloud computing describes a broad movement to treat [information technology (IT)] services as a commodity with the ability to dynamically increase or decrease capacity to match user needs." Statement of Objectives at 1. In this regard, cloud computing delivers computing services via networks with the potential to provide IT services more quickly and at a lower cost. Cloud computing provides users with on-demand access to a shared and scalable pool of computing resources with minimal management effort or service provider interaction. Information Technology Reform: Progress Made but Future Cloud Computing Efforts Should be Better Planned, GAO-12-756 at 1 (July 2012). By leveraging shared infrastructure and economies of scale, cloud computing allows users to control the computing services they access, while sharing the investment in the underlying IT resources among consumers. Statement of Objectives at 1.

Here, the contractor generally was to provide a copy of its existing public cloud (modified where necessary) to be installed on government premises and operated by the provider. Performance is to include both: (1) infrastructure as a service, in which the provider (contractor) is responsible for networking, storage, servers and virtualization, and the consumers (government agencies) are responsible for the operating system, middleware, runtime, data, and applications, System Requirements Document (SRD) Fig. 2-2; and (2) platform as a service, which encompasses the same components as infrastructure as a service, but only applications and data are the responsibility of the consumer.[1] Id.

---

[1] The concepts of infrastructure as a service, and platform as a service are also referenced in GAO's audit work on cloud computing. Information Technology Reform: Progress Made but Future Cloud Computing Efforts Should be Better Planned, supra, at 4.

In addition, the required intelligence community cloud was to provide for auto-scaling, SRD § 3.9.1, that is, a mechanism that allows computing infrastructure to automatically scale up or down the number of computer resources that are being used to support an application, based on the needs of that application at a specific time. Contracting Officer's Statement (COS) at 8. Without this capacity, customers must anticipate when surge capacity is required and provision it in advance. Id. Further, of significance for this protest, the solicitation provided that the intelligence community cloud system (for both infrastructure as a service and platform as a service) was to permit consumers (here, the intelligence community agencies) to run their own applications (those not provided by the cloud provider) on the cloud, and the cloud was to provide "scalable" solutions, with respect to applications, including those provided by the consumer. See SRD §§ 3.4.11, 3.9.1.

The solicitation provided for an initial mandatory qualification evaluation to verify that an offeror was an established commercial cloud service provider with an existing, large-scale public offering. This was to be followed by the evaluation of proposals under four factors: (1) technical/management, including subfactors for technical approach (evaluated under a demonstration/oral presentation element and a written element), service level agreements, and management; (2) past performance; (3) security, evaluated on a pass/fail basis; and (4) price.

Price was to be evaluated for completeness, reasonableness, and to determine the offeror's understanding of the government's requirements. Evaluation Criteria at 5. Offerors were required to submit a fixed price for task order 1 for program management to achieve initial operating capability, and a guaranteed minimum price for task order 2 for the provision of cloud services for the first year after initial operating capability. In addition, offerors were to provide a Cloud Services Catalog Price List containing fixed prices for various services. Also, the solicitation set forth six representative service-type ordering scenarios; using their proposed catalog prices, offerors were to calculate the total costs of orders for each scenario, on a yearly basis, for the base performance period. The total evaluated price was to be comprised of the sum of the task order 1 pricing and the prices for the six ordering scenarios for the base period. Price Instructions at 1; Evaluation Criteria at 5.

Five offerors, including IBM and Amazon, submitted proposals by the July 13, 2012, closing time. Shortly thereafter, two offerors (AT&T Corporation and Microsoft Corporation) filed protests with our Office challenging various aspects of the mandatory qualification requirements, and a third offeror withdrew its proposal. When the agency elected to take corrective action by amending the RFP to remove the qualification language challenged in the protests, we dismissed both protests as academic (B-407073, B-473073.2, Aug. 17, 2012).

Based upon the subsequent demonstrations/oral presentations and the evaluation of proposals by the technical/management evaluation team, past performance

evaluation team, and price evaluation team, the agency decided to include the proposals of IBM, Amazon, and a third offeror in the competitive range. After discussions with the competitive range offerors, the agency requested submission of final proposal revisions (FPR).

In its evaluation of FPRs, the technical/management evaluation team assigned a deficiency to IBM's proposal under the demonstration element (within the technical approach subfactor) as a result of language in the firm's FPR that appeared to indicate that its existing public cloud could not provide auto-scaling for applications provided by the consumer. The technical/management evaluation team also assigned a significant weakness under the written element of the technical approach subfactor for IBM's failure to make clear in its proposal how IBM would modify its existing commercial cloud to provide the required auto-scaling capability for the intelligence community.

In addition, because the offerors appeared to have adopted materially different interpretations of the scenario requirements, the price evaluation team adjusted offerors' prices (both up and down) using each offeror's proposed catalog prices in order to "provide a common basis for comparing price." Report on Final Cost Proposals at 5. The agency's adjustment of IBM's FPR scenario 5 price increased IBM's price for this scenario from approximately [deleted] to approximately [deleted].

The final consensus evaluation for IBM and Amazon was as follows:

|  | Amazon | IBM |
|---|---|---|
| **Technical /Management** |  |  |
| **-- Technical Approach (Demo)** | Very Good | Marginal |
| **-- Technical Approach (Written)** | Exceptional | Very Good |
| **-- Service Level Agreements** | Very Good | Satisfactory |
| **-- Management Approach** | Satisfactory | Very Good |
| **Past Performance (confidence)** | High | Moderate |
| **Security** | Pass | Pass |
| **Proposed Price** | [deleted] | [deleted] |
| **Evaluated Price** | $148.06 million | $93.9 million |
| **Guaranteed Minimum** | [deleted] | [deleted] |
| **Overall Proposal Risk** | Low | High |

Source Selection Decision (SSD) at 1.

Based upon the above evaluation results, the source selection authority (SSA) concluded that Amazon's proposal represented the best value. In this regard, while IBM's proposal offered an evaluated [deleted] price advantage over 5 years, the SSA concluded that this advantage was offset by Amazon's superior technical solution. SSD at 8.

Prior to contract award, and in accordance with the terms of the RFP, the agency conducted post-selection negotiations with Amazon to address certain matters in its proposal. RFP at 47. Upon learning of the ultimate award to Amazon and after receiving a debriefing, IBM filed this protest.

DISCUSSION

IBM raises numerous challenges to the evaluation of its technical and price proposals, the conduct of discussions (including the post-selection negotiations with Amazon), and the evaluation of Amazon's past performance. Based upon our review of the record, we find for IBM on its challenges to the agency's price evaluation under one of the solicitation's price scenarios, and the conduct of post-selection negotiations. For these reasons we sustain the protest. We deny IBM's challenges to the agency's evaluation of Amazon under the past performance evaluation factor. We have considered all of IBM's arguments and discuss the most significant below.

Scenario 5 Evaluated Price

As set forth above, offerors were required to address six notional scenarios. Scenario 5, for data analytics, was identified as platform as a service (everything but applications and data are the responsibility of the contractor), and included the following description:

> This scenario centers around providing a hosting environment for applications which process vast amounts of information in [parallel] on large clusters (1000s of nodes) of commodity hardware in a reliable, fault-tolerant manner (MapReduce). The solution to this scenario should automatically provision clusters of compute for the segmentation and [parallel] processing of input datasets via the MapReduce framework (3.4.1) where the vendor is responsible for the management of the OS [operating system] and MapReduce implementation. <u>Assume a cluster large enough to process 100TB [terabytes] of raw input data.</u> Assume input data set was loaded from available object-based storage that realizes 6 reads/second and 2 writes/second. <u>Assume 100% duty cycle on all virtual machines associated with this scenario.</u>[2] (Total storage for each order shall be 100 TB object. Read/writes and IOPS [input/output operations per second] should be calculated per order).

---

[2] Duty cycle refers to the percentage of time a computer spends in an active state as a fraction of the total duration. IBM First Supplemental Protest at 40. If the duration is 1 year, a 100% duty cycle would cover 8,760 hours of time. COS at 33.

RFP, amend. 4, Scenario 5 Description (emphasis added).

Pointing to the solicitation reference to a "100% duty cycle" and the pricing instruction's request for yearly prices, the agency explains, in its report and at the hearing our Office conducted in this matter, that it was requesting under scenario 5 the prices for simultaneously running a large number of orders, each consisting of 100 TB of data, repeatedly throughout the year. COS at 28-29; Hearing Transcript (Tr.) 269-71. Because IBM's FPR price was based on a single run processing 100 TB of data, multiplied by the specified number of orders for the period (30 for the first year), the agency used IBM's proposed catalog pricing and the services identified in its FPR for this scenario, to adjust the firm's price to represent 1 year of continual processing for each order.

IBM asserts that the agency's adjustment of its scenario 5 price was unreasonable. In this regard, IBM maintains that the agency imposed an unstated requirement that each 100 TB data analytics unit provided under this scenario was to be continually repeated throughout the entire year. In contrast, under the protester's interpretation (as reflected in its FPR), it was only required to propose a solution capable of processing a single 100 TB data run with no specified duration. IBM First Supplemental Protest at 40. IBM explains that it therefore proposed an "optimal" price for a level of services (e.g., computer capacity) with a processing time of approximately [deleted], which represented a single run of 100 TB of data. Tr. at 410.

As an initial matter, we find untimely IBM's challenge to the agency's interpretation that scenario 5 called for repeated 100 TB data runs throughout the year, rather than a single run under each order. In this regard, prior to submitting its initial proposal, IBM asked two questions seeking additional information about the scenario's technical parameters. Specifically, IBM first asked:

> Are orders the number of new images of that scenario type that are loaded to the image store/catalog in the year or are they the number of instantiations/runs of that scenario type in a year?

Question/Answer No. 49. The agency responded that "[a]s outlined in the scenario, the servers should be treated as operating on 100% duty cycle and should be priced out as simultaneous orders." Id.

IBM's second question was more detailed, requesting detailed information concerning the scenario requirements. Among other things, IBM's second question asked if concurrent data analytics users would be running jobs, what would be the anticipated average number of runs of each scenario type daily, monthly, etc., and how many analytic jobs were expected to be concurrently executing. Question/Answer No. 50. In response, the agency repeated its answer to Question No. 49, and added:

> The contractor should propose commercial best practices derived from their commercially available solution(s) to provide data analytics via the MapReduce software framework to concurrent users from multiple organizations.

Id.

Without further inquiry, IBM initially priced scenario 5 at approximately [deleted], based on the specified number of orders, with 12 months of availability. Thus, IBM's initial approach, consistent with the manner in which all other offerors in the competitive range prepared their pricing, appeared to be based upon continual 100 TB data runs throughout the year. COS at 32-33; IBM Initial Proposal at VI-17 (proposal of services at 12 months each); Tr. at 428-29 ("7/24/365" capacity approach). However, in its FPR, IBM (but not the other offerors) reduced its scenario 5 price to approximately [deleted], based on a single run for each of the specified number of orders.

Under our Bid Protest Regulations, a solicitation defect apparent on the face of the solicitation must be protested prior to the time set for receipt of initial proposals or quotations, when it is most practicable to take effective action against such defects. 4 C.F.R. § 21.2(a)(1) (2013). Furthermore, an offeror who chooses to compete under a patently ambiguous solicitation does so at its own peril, and cannot later complain when the agency proceeds in a way inconsistent with one of the possible interpretations. Wackenhut Servs., Inc., B-276012.2, Sept. 1, 1998, 98-2 CPD ¶ 75 at 5; CardioMetrix, B-274585, Nov. 18, 1996, 96-2 CPD ¶ 190 at 3; Watchdog, Inc., B-258671, Feb. 13, 1995, 95-1 CPD ¶ 69 at 5.

Here, by its own actions, IBM evidenced its recognition that the scenario 5 instructions were ambiguous as to the frequency of the expected 100 TB data runs. IBM requested clarification of the requirements in this regard and then, not having received meaningful clarification, first adopted one interpretation (that is, continual runs) in its initial proposal and then a different interpretation (a single run per order) in its FPR. Having chosen to compete despite its recognition of the patently ambiguous nature of the solicitation in this area, IBM cannot now complain when the agency proceeds in a manner inconsistent with one of the possible interpretations and adjusts IBM's price to match the government's (and Amazon's apparent) interpretation of the requirement. See, e.g., Wackenhut Servs., Inc., supra.

That said, while we view as untimely IBM's challenge to the agency's interpretation that continual runs (100% duty cycle for 1 year) were required under scenario 5, its challenge to the agency's calculation of an evaluated price for scenario 5 is not untimely.

In this regard, our Office will review the reasonableness or consistency of the evaluation method the agency employs. See Federal Computer Int'l Corp., B-276885, July 29, 1997, 97-2 CPD ¶ 35 at 3. In meeting the requirement to consider cost or price to the government in evaluating competitive proposals, 41 U.S.C. § 3306(c)(1)(B) (2011), an agency's chosen method of evaluation must include some reasonable, common basis for evaluating or comparing the relative costs of proposals. See Aalco Forwarding, Inc., et al., B-277241.15, Mar. 11, 1998, 98-1 CPD ¶ 87 at 11. Ordinarily, normalization--which is the term used by the parties here--involves the measurement of offerors' costs against the same baseline where there is no logical basis for differences in approach or where there is insufficient information provided with the proposals, leading to the establishment of common estimates by the agency. See Bendix Field Eng'g Corp., B-246236, Feb. 25, 1992, 92-1 CPD ¶ 227 at 17.

Here, the record indicates that the agency lacked sufficient information to ensure that proposals were evaluated on a common basis with respect to scenario 5. In this regard, the agency attempted to ensure that offerors were evaluated on a common basis with regard to scenario 5 by scaling IBM's single-run price upwards to equal one year of continual processing for each order. Generally, this resulted in assuming that each IBM 100 TB data run, indicated by IBM to take [deleted], would be repeated approximately [deleted] times in a year. Tr. at 361, 375.

However, while Amazon's scenario 5 price indicated that it, like every other offeror besides IBM, assumed repeated 100 TB data runs throughout the year, an agency adviser to the price evaluation team (and author of scenario 5) testified that based on the information in the proposal, the agency did not know how long a single 100 TB data run would take using Amazon's proposed solution. Tr. at 314, 378. Specifically, Amazon's proposal made various assumptions about running 100 TB data sets at "100% duty cycle" and "leveraging [its] [deleted]," and "priced [its] [deleted]" instance type for 100% of the time, but it did not propose a specific time for a single 100 TB data run. Amazon Proposal at VI-32-33. Thus, there was no way from the information available concerning Amazon's solution to ascertain how many 100 TB data runs were included in Amazon's scenario 5 pricing.

Further, the agency recognized that solutions (and prices) could vary based on the makeup of virtual machines--the amount of locally available storage, the amount of memory, the amount of virtual compute cores proposed--and how fast a unit processes 100 TB of data, all of which would have an effect on performance, including how many times a solution could process that amount of information in a given period. Tr. at 344, 347. In this regard, while Amazon's proposed scenario 5 solution included [deleted] compute units or [deleted] virtual cores (i.e., divisions within the virtual computer available for separately processing information without interfering with one another), IBM's solution included [deleted] virtual cores; [deleted]. Tr. at 386-88.

In sum, given the agency's uncertainty regarding just what performance (e.g., number of 100 TB data runs) was included in each evaluated price, there is no basis for concluding that Amazon was evaluated for scenario 5 using the same or otherwise comparable level of performance as included in IBM's adjusted price. Thus, we find the price evaluation to be unreasonable and we sustain the protest on this basis.

Post-Selection Negotiations

The RFP included the following provision regarding software certification:

> The Contractor certifies that it will undertake to ensure that any software to be provided . . . under this contract will be provided . . . free from computer virus, which could damage, destroy, or maliciously alter software, firmware, or hardware, or which could reveal to unauthorized persons any data or other information accessed through or processed by the software.

RFP Commercial Clause § 152.204-706(a). In its post-selection negotiations with Amazon, Amazon proposed, and the agency accepted, modifying the above solicitation clause as follows: "The Sponsor agrees that 'only software developed and provided by [Amazon] would be subject to this requirement.'" Memorandum of Understanding, Feb. 12, 2013, at 3.

IBM asserts that in agreeing to this modification, the agency relaxed a material requirement of the solicitation. The agency responds that post-selection negotiations were contemplated by the RFP, RFP at 47 ("The Government intends to select for final negotiations a contractor(s) resulting from this solicitation whose proposal represents the best value . . . ."), and that this modification does not represent a material change to the RFP's requirements or Amazon's obligations. We disagree.

It is a fundamental principle of government procurement that competition must be conducted on an equal basis; that is, offerors must be treated equally and provided with a common basis for the preparation of their proposals. Systems Mgmt., Inc.; Qualimetrics, Inc., B-287032.3, B-287032.4, Apr. 16, 2001, 2001 CPD ¶ 85 at 8. When, either before or after receipt of proposals, the government changes or relaxes its requirements, it must issue an amendment to notify all offerors of the

changed requirements and give them an opportunity to respond. Diebold, Inc., B-404823, June 2, 2011, 2011 CPD ¶ 117 at 4; Systems Mgmt., Inc.; Qualimetrics, Inc., supra; see Cardkey Sys., B-220660, Feb. 11, 1986, 86-1 CPD ¶ 154 at 2 (If it becomes apparent that the contract being negotiated differs significantly from the requirements stated in the RFP, the contracting agency must amend the RFP or, at the least, advise offerors of the change during discussions and seek new offers.) We will sustain a protest where an agency, without issuing a written amendment, materially alters the solicitation's requirements to the protester's prejudice. See Systems Mgmt., Inc.; Qualimetrics, Inc., supra.

Here, the record indicates that the modification of the RFP clause to the negotiated language materially reduced Amazon's obligations from those imposed in the RFP. In this regard, the RFP clause required the offeror to certify its undertaking to ensure that "any software" provided will be virus free, while the modified language covered "only software developed and provided" by Amazon. This is significant because Amazon's proposal contemplated the provision of third party and open-source software that is not developed by Amazon and thus would not fall within its modified certification. See, e.g., Amazon Proposal at 1-4,1-9 ("rich ecosystem of . . . third-party security tools"), and at 1-13, 1-23, 1-26, 2-38 (proposed use of "MySQL" and "Red Hat Enterprise Linux," an open-source database and software product, respectively).

During the hearing before our Office, the agency admitted that, at the time of the post-selection negotiations, it did not consider the impact of the modified language; it understood that Amazon was certifying all software and did not realize that the change might be a restriction on the certification. Tr. at 486-88. Indeed, the contracting officer testified that had the agency focused more closely on the modification, it would have taken exception to the revision. Tr. at 502-03. Thus, the hearing testimony suggested that the new language represented a material change to the terms of the underlying competition.

Both at the hearing and in briefs filed after the hearing, however, the agency asserts that this change was not significant because Amazon is still required to comply with other provisions of its contract. For example, the agency points out that SRD § 3.13.2 required C2S infrastructure and services to be "assessed and authorized in accordance with Intelligence Community Directive (ICD) 503 (reference 3)," which provides for the agency to incorporate standards, policies, and guidelines issued by the National Institute of Standards and Technology and the Committee on National Security Systems (CNSS). Agency Post Hearing Comments at 20. One aspect of these standards includes "malicious code protection," and Amazon's detailed proposal to meet these requirements was incorporated into the contract. Tr. at 470-72; Amazon System Security Plan, Appendix B-91--B-93.

We see no basis in the contemporaneous record to support a conclusion that the agency made its decision to allow the modification based on these other provisions

of the solicitation, or on Amazon's agreement to them.[3] In this regard, while we consider the entire record in resolving a protest, including statements and arguments in response to a protest, in determining whether an agency's selection decision is supportable, we accord greater weight to contemporaneous evaluation and source selection materials than to new judgments made in response to protest contentions. Boeing Sikorsky Aircraft Support, B-277263.2, B-277263.3, Sept. 29, 1997, 97-2 CPD ¶ 91 at 15. We accord lesser weight to post hoc arguments or analyses because we are concerned that judgments made in the heat of an adversarial process may not represent the fair and considered judgment of the agency, which is a prerequisite of a rational evaluation and source selection process. Id. Here, given the contracting officer's testimony that, had the agency focused on the modification requested by Amazon, it would have taken exception, we find no basis for accepting the agency's current assertion that the modification was not material.

In any case, the agency's current position does not show that the modification was not material. In this regard, the agency now contends that the only aspects not covered by Amazon's agreement to the certification requirements were (1) the certification itself, which the agency believes would be satisfied by Amazon signing its contract; and (2) the requirement to immediately notify the contracting officer of an issue with malicious code. Agency Post Hearing Comments at 20. However, regardless of the agency's position with respect to the certification, it is unclear why elimination of Amazon's obligation to immediately notify the contracting officer about malicious code would not represent a change in a material requirement.[4]

---

[3] The agency also generally claims that the SSA was briefed on the final negotiation items and felt this was a minor issue. Tr. at 469; SSD at 9. The contracting officer was unaware of the impact of this particular provision and there is nothing in the record to indicate that he provided a relevant assessment of that impact in the briefing to the SSA or that the SSA exercised otherwise considered judgment in this regard.

[4] Our conclusion is not changed by Amazon's assertions that IBM also sought numerous proposed changes to provisions in the RFP, including a proposal that it would not provide [deleted] with respect to [deleted]. IBM FPR at 5-8; see Intelligent Env'ts, B-256170.2, Nov. 28, 1994, 94-2 CPD ¶ 210 at 4 (protest denied where neither protester nor awardee complied with specific requirement). While offerors were free to ask for changes, waiving a material term of the solicitation for only one of them, after the selection decision was made, was improper. We also disagree with Amazon that IBM cannot claim to be prejudiced by this change. IBM argues that this modification materially reduces the risk to the contractor. IBM Supplemental Comments, May 6, 22013, at 8. In our view, IBM's assertion that the level of risk to the contractor was reduced by this modification is sufficient to establish prejudice.

B-407073.3 et al.

In sum, we find that the agency, without issuing a written amendment, materially relaxed the solicitation's requirements for Amazon without affording the other offerors an opportunity to propose to the modified requirements. Accordingly, the protest is sustained on this basis as well.

Auto-Scaling Evaluation

During the agency's final evaluation, the evaluators assigned IBM's proposal a deficiency under the demonstration factor because they found that IBM's FPR introduced new language that cast doubt on whether the firm's existing public cloud provided auto-scaling for all applications, both IBM-supplied and agency consumer-supplied. COS at 9. While the evaluators found that IBM's proposed C2S cloud for the intelligence community included auto-scaling capability for all applications, they also assigned a significant weakness because there was a lack of detail on how this additional capability (relative to the existing public cloud) would be accomplished. Id. at 13. IBM asserts that the agency's evaluation was irrational and that its proposal made clear that its public cloud provided auto-scaling capability for all applications whether supplied by IBM or agency consumers.

In considering protests challenging an agency's evaluation of proposals, we will not reevaluate proposals; rather, we will examine the record to determine whether the agency's evaluation conclusions were reasonable and consistent with the terms of the solicitation and applicable procurement laws and regulations. Gonzales-Stoller Remediation Servs., LLC, B-406183.2 et al., Mar. 2, 2012, 2012 CPD ¶ 134 at 5. A protester's disagreement with a procuring agency's judgment is insufficient to establish that the agency acted unreasonably. Sig Sauer, Inc., B-402339.3, July 23, 2010, 2010 CPD ¶ 184 at 6.

Here, the proposal instructions required each offeror to "clearly demonstrate its understanding of the technical requirements and suitability of the proposed technical approaches that will be employed." Evaluation Criteria at 2. Moreover, it is an offeror's obligation to submit an adequately written proposal for the agency to evaluate. See Independence Constr., Inc., B-292052, May 19, 2003, 2003 CPD ¶ 105 at 5.

Our review of the record shows that the RFP clearly required offerors to demonstrate the ability to auto-scale computer resources both in their existing public cloud and in the C2S cloud solution. Specifically, the cloud was to provide "dynamic workload management . . . across the cloud infrastructure," SRD § 3.4.11, and "shall provide application services with . . . automated scaling." SRD § 3.9.1. While IBM's initial presentation demonstrated its auto-scale capability for applications from its existing public cloud structure, in its FPR, IBM revised its written proposal in support of the demonstration so as to indicate that its ability to auto-scale in its existing public cloud structure was limited to applications provided by IBM. In this regard, in referring to its capability to auto-scale, IBM's FPR drew a

distinction between [deleted].  IBM FPR at 1-25.[5]  This distinction was continued in a figure from its FPR indicating that, [deleted].[6]  Id. at 1-26.  Thus, IBM's FPR suggested that the ability to auto-scale in its existing public cloud structure was limited and did not apply to all services.

As explained by the agency, it had "grave" concerns about IBM's auto-scaling capability when it considered these limiting references in conjunction with a subsequent statement in IBM's FPR that an application was to be selected based on "catalog choices."  IBM FPR at 1-28; Tr. at 50-51.  According to the agency, it interpreted this and other uses of "catalog" in IBM's proposal to refer to the C2S service catalog, a listing of IBM's fixed prices for cloud services.  Supplemental COS at 3.  While agency consumers could add their own applications to an overall "library" for their use (SRD § 3.4.13), the IBM service catalog could not be altered by agency consumers.  Id.  Thus, given the indications in IBM's FPR that auto-scaling in its existing public cloud structure was limited to applications from IBM's service catalog, and that consumer applications could not be added to that catalog by the consumer, the evaluators could not conclude that IBM's existing public cloud structure, as described in its FPR, provided a mechanism through which an application furnished by an agency consumer could be auto-scaled.  Final Technical Evaluation Report at 8.

In response to the agency's arguments, the protester identifies a number of places in its FPR where it used the word catalog in a more generic sense, thus indicating that its reference to selecting applications from the "catalog" was not intended to mean the service catalog provided by IBM.  For example, IBM's FPR stated that the "[intelligence community] can build custom applications for inclusion in the image library or catalog."  FPR at 2-7, 2-8.  In addition, at a later stage of the demonstration, where IBM showed its ability to add consumer applications to a library, the IBM presenter stated that "that image now exists in the catalogue." Tr. at 113.  IBM also notes that even the RFP uses the term catalog other than in the context of the services catalog.  Specifically, it refers to the requirement that an offeror provide an image library, a repository for virtual images and VM templates "to be managed and selected from the catalog."  SRD § 3.4.13.

Our review of the record indicates that these various references suggest that IBM may in fact have auto-scaling capability for consumer applications.  However, while the cited passages in IBM's FPR established, e.g., that consumer applications can be added to the "library," and that "applications" can be auto-scaled in IBM's

---

[5] In providing both platform and infrastructure as services, an "instance" refers to the supply of a virtual machine or server for use by the consumer.  Tr. at 45-46.

[6] Load balancing refers to the distribution of computer workload across multiple servers, while auto-scaling refers to changing the capacity of a particular server.

existing public cloud structure, there is no place in the FPR where IBM clearly and affirmatively stated that its existing public cloud structure can auto-scale all applications, whether provided by IBM or the consumer. Tr. at 70, 220. Likewise, there is no clear statement in the FPR defining what the applications catalog is as distinguished from the IBM-supplied service catalog.

We recognize that IBM's proposed cloud for the intelligence community--i.e., the contract at issue here--promised the capability to auto-scale all applications. However, the above deficiency was assigned for failure to demonstrate the existence of this capability in IBM's existing public cloud, a different element of the evaluation. Further, since we find the agency reasonably determined that IBM failed to clearly establish the capability of its existing public cloud to auto-scale all applications, there is no basis to find unreasonable the agency's assignment of a significant weakness, under a different evaluation element (the written element), as a result of IBM's failure to explain how it would add the capability to auto-scale all applications in the cloud it proposes to provide for the intelligence community.

We see no basis to question the reasonableness of the agency's concerns (expressed as a deficiency and a significant weakness under the technical approach subfactor) that IBM's proposal failed to adequately explain its auto-scaling capabilities. Accordingly, this aspect of the protest is denied.

Past Performance Evaluation

IBM also argues that the past performance evaluation of Amazon's proposal was flawed because the agency failed to take into account news reports about five service outages experienced by some of Amazon's public cloud clients between April and December 2012, while the agency was conducting this procurement.[7] IBM First Supplemental Protest at 57. IBM contends that this information was relevant to the past performance evaluation, noting that the second most important element under the past performance factor was whether an offeror's "performance history demonstrates success in meeting management, delivery, and performance requirements within the terms of a Service Level Agreement [SLA]." Evaluation Criteria at 3-4. IBM argues that had the agency considered this information, Amazon's past performance rating would have been lower than high confidence.

Our Office has recognized that in certain limited circumstances an agency evaluating an offeror's past performance has an obligation (as opposed to the discretion) to consider outside information bearing on an offeror's past performance. New Orleans Support Servs. LLC, B-404914, June 21, 2011 CPD ¶ 146 at 5.

---

[7] These outages were reported in various media outlets, including, for example, The Washington Post, The New York Times, The Wall Street Journal, and Cable News Network. IBM First Supplemental Protest, Exhs. D through P.

Where we have charged an agency with responsibility for considering such outside information, the record has demonstrated that the information in question was "too close at hand" to require offerors to shoulder the inequities that spring from an agency's failure to obtain, and consider, the information. Id.; see e.g., International Bus. Sys., Inc., B-275554, Mar. 3, 1997, 97-1 CPD ¶ 114 at 5; G. Marine Diesel, B-232619.3, Aug. 3, 1989, 89-2 CPD 101 at 4-6 (contracting officer who was personally aware of the awardee's continuing difficulties in performing a contract for services related to the subject solicitation, and who considered those difficulties in deciding not to exercise the remaining options, erred in not considering the difficulties when evaluating proposals).

The record here shows that the contracting officer, the SSA, and other members of the evaluation team, were aware of the news reports regarding the service outages, Addendum to Supplemental Agency Report at 1, but concluded that the reports and their knowledge of the circumstances surrounding the outages were not sufficiently detailed to take the outages into account in the past performance evaluation. Id.; Contracting Officer's Declaration, Apr. 25, 2013; SSA Declaration, Apr. 26, 2013. For example, as noted by the SSA, none of the cited news reports addressed Amazon's success in meeting the terms of its SLAs with the affected customers. SSA Declaration, Apr. 26, 2013.

In addition, the record shows that one of Amazon's past performance references acknowledged outages in Amazon's system. Specifically, the National Aeronautics and Space Administration, Jet Propulsion Laboratory (JPL), rated Amazon as very good for meeting SLAs, despite reported outages, commenting:

> [Amazon] has experienced some outages, especially in their Virginia region. However, this has had no impact on JPL, and as a percentage of the overall availability, these outages are miniscule. All cloud vendors have outages. All private clouds and private data centers have outages. The difference is that we hear about them when they happen in a public cloud, such as [Amazon]. JPL operates mission critical services in the [Amazon] cloud and we have had 100% uptime since inception. To achieve this, we implement failover and elastic load balancing but it's simple and inexpensive and very much worth it.

JPL Past Performance/Questionnaire at 3.

In conclusion, we see no basis to find that the agency improperly evaluated Amazon's proposal under the past performance factor.

Evaluation of Guaranteed Minimum Prices

IBM asserts that the agency improperly considered the effect of its guaranteed minimum price on its total evaluated price. In this regard, IBM relies on the RFP

language that the guaranteed minimum would not be used as part of the total evaluated price. Evaluation Criteria at 5. IBM's assertion is without merit.

The guaranteed minimum price feature of this solicitation was intended to allow the offerors to recover a portion of the upfront infrastructure expenditures and to reduce their cost risk. Source Selection Evaluation Board (SSEB) Recommendation at 19. The RFP specifically provided that the guaranteed minimum proposed by each offeror would be evaluated for completeness and reasonableness and would "be used within the Government's overall risk rating involved with this acquisition." Evaluation Criteria at 5. The SSEB, in its discussion of the offerors' guaranteed minimum prices, addressed the risk involved with IBM's minimum by noting that [deleted]. SSEB Report at 20. The SSEB also found "serious cost risk" associated with IBM's proposed contract clause which indicated that the contractor would [deleted]. Id. The SSEB observed that if the guaranteed minimum was "considered as part of the likely cost," it would reduce the price difference between IBM and Amazon. Id. The SSA made similar observations in her source selection decision. SSD at 9.

In our view, the evaluation in this regard was not inconsistent with the RFP's evaluation criteria. The record shows that IBM's evaluated price was not increased by the amount of its guaranteed minimum. See, e.g., SSD at 8. Rather, the SSEB's evaluation and the SSA's tradeoff analysis simply considered the risk involved in IBM's guaranteed minimum and future position on negotiations. While IBM objects to consideration of the magnitude of its guaranteed minimum, clearly the magnitude of the guarantee was a factor in the extent of the resulting risk, which under the RFP was to be evaluated.

RECOMMENDATION

We sustain the protest because the agency's adjustment of scenario prices was unreasonable in that it did not result in evaluation on a common basis, and because the agency materially relaxed a solicitation term for the awardee during post-selection negotiations. We recommend that the agency reopen the competition and amend the RFP as necessary to ensure that proposals are prepared and evaluated on a common basis, consistent with the issues discussed in this decision. We further recommend that the agency conduct discussions with offerors, obtain and evaluate revised proposals, and make a new source selection decision. Finally, we recommend that the protester be reimbursed its costs of filing and pursuing the protest, including reasonable attorneys' fees. 4 C.F.R. § 21.8(d)(1).

The protester's certified claim for costs, detailing the time expended and costs incurred, must be submitted to the agency within 60 days after receipt of this decision.  4 C.F.R. § 21.8(f)(1).

The protest is sustained.

Susan A. Poling
General Counsel